601 S.E.2d 6

**Joshua Davis KYER**

v.

**COMMONWEALTH of Virginia.**

Record No. 2200–03–2.

Court of Appeals of Virginia,
Richmond.

Aug. 17, 2004.

James R. Cooke, Jr., for appellant.

John H. McLees, Senior Assistant Attorney General (Jerry W. Kilgore, Attorney General, on brief), for appellee.

Present: BUMGARDNER, HUMPHREYS, JJ., and HODGES, Senior Judge.

ROBERT J. HUMPHREYS, Judge.

Joshua Davis Kyer appeals his convictions, after a bench trial, for three counts of statutory burglary, in violation of Code § 18.2–91 and three counts of petit larceny, in violation of Code § 18.2–96. Kyer argues the trial court erred in refusing to suppress certain evidence, which he alleges was "obtained as a result of an illegal, warrantless search and seizure." For the reasons that follow, we affirm.

## I. Background

As the parties conceded below, the facts in this case are essentially "uncontroverted." On August 26, 2002, Officer B.E. Davis and Detective Brent Story, of the Chesterfield County Police Department, responded to an "ACTF" alarm that had been activated at Southside Speedway. It was approximately 2:00 a.m. Officer Davis was in uniform; Detective Story was wearing "a shirt and tie." As they arrived on the scene, they observed two individuals running from the establishment.[1] The officers were able to apprehend only one of the individuals. That individual subsequently implicated a "Mr. Able" in the burglary.[2] The officers immediately went to Mr. Able's home and questioned him. Mr. Able implicated Kyer in the burglary and agreed to take the officers to Kyer's home.

The officers arrived at Kyer's home at approximately 4:00 a.m. that morning. As they approached the front door, they observed that the door was open "wide enough for [Officer Davis] to walk through it without touching the door." It was

---

1. Upon investigating the alarm, officers found that "six or so" doors had been "forcibly entered" and "several items" had been taken. This same location had been burglarized on two other occasions, within the past 60 days.

2. According to the record, "Mr. Able" was a third individual who was involved in the burglary. Police had observed "Mr. Able" near the scene. However, "Mr. Able" was in a car and, although the officers suspected he had been involved in the burglary, they did not have sufficient information "to hold him" at that time.

dark and raining, and "[t]here were no exterior lights" on, nor lights on inside the home.

Because of the circumstances, Officer Davis and Detective Story believed that "[s]omeone had forced entry or broken into the home." Accordingly, they "made a . . . plan," discussing how they would respond if they "encounter[ed] any opposition." The officers then "knocked on the door several times," announcing their presence. After "a couple" of minutes, and after hearing no response from inside the home, the officers drew their firearms and flashlights and proceeded inside the home and up the stairs, "continuing to announce [their] presence" in "loud voice[s]."

While conducting a "protect[ive] sweep" of all of the rooms of the home, Officer Davis found that two people were in the home, "asleep in their beds." "Less than two minutes" later, while Detective Story waited in the "living room" of the home, Officer Davis awoke one of the sleeping individuals by shining his flashlight "on her." The officers later learned that individual was Kyer's mother. When she awoke, Officer Davis identified himself, inquired as to her well-being, and asked if anyone else was "supposed to be in the house." Kyer's mother responded that "her sons were." The officers then woke up Kyer's brother, the only other person they had observed sleeping in the home.

After Kyer's mother "g[ot] herself together," approximately ten minutes after Officer Davis woke her up, Officer Davis and Detective Story met with her and Kyer's brother in the "common area" of the home. Detective Story "sat down in a chair across from her, explained . . . what was going on and why [they] had been there originally and also explained to her why [they] came in in the first place so she would understand that." Officer Davis then asked Kyer's mother if they could "check[ ] the house for anything that was stolen from the Southside Speedway." Kyer's mother agreed. Officer Davis subsequently found several of the missing items in Kyer's bedroom.

Kyer was charged with three counts of statutory burglary and three counts of petit larceny. Because Kyer was a minor, he was tried and convicted of the charges in the juvenile and domestic relations district court. Kyer appealed his convictions to the circuit court and prior to his trial *de novo*, filed a motion to suppress the evidence against him, arguing the officers' search was "conducted without a warrant and was not within any exception to the warrant requirement."

During the hearing on Kyer's motion to suppress, Detective Story testified that he had "worked the midnight shift for over nine years in patrol" and that it was not "uncommon" to approach homes and find doors standing open. He stated, "[e]very time [this occurs], we make entry to make sure everything inside is okay."

Kyer's counsel subsequently argued that the officers did not enter the home because of an "exigent circumstance," but agreed that if the officers were exercising their "community caretaker function" in entering the home, their entry would be a "justifiable exception[ ] to the prohibition against a warrantless search." Nevertheless, Kyer's counsel contended that the evidence demonstrated they entered the home, not for purposes of exercising their community caretaker function, but for the pretextual purpose of investigating Kyer's "criminal activity." Kyer's counsel argued further:

> The other issue, Your Honor, that I think is important to consider is that, you know, this is a residence. This isn't a car. This isn't some sort of thing where we have a lesser expectation of privacy. This is someone's home. I heard the officer testify that they have a practice of entering homes. However, I mean, in my experience, I've not known police to enter homes just simply because a door is ajar.
>
> \* \* \* \* \* \*
>
> The only remaining issue, Your Honor, would be whether or not any consent obtained thereafter would be acceptable or valid[.] ... I think another issue here, Judge, is whether or not under those circumstances a person can give a voluntary, uncoerced kind of consent.

The trial court ruled as follows, in relevant part:

I find that ... it was appropriate for the officers to enter the residence, although they certainly arrived there initially as part of the conduct of the criminal investigation, I do think that the community caretaker doctrine and/or exigent circumstances permitted their entry into the residence. Particularly, I find that their initial contact or investigation was objectively reasonable, but the intrusion was limited and I do not find that the police officers in this case were acting under a pretext.... I also find that even in the absence of evidence that [Kyer's mother] was expressly advised that she had the right to withhold consent, the totality of the circumstances are not sufficient to have vitiated her consent. So, on that ground, irrespective of what decision the Court might reach on the question of exigent circumstances or exercising community caretaker function [sic], the consent was valid. Therefore, I'm going to overrule the motion to suppress ....

Kyer subsequently pled "Not Guilty" to the charges, but conceded that the evidence summarized by the Commonwealth would be sufficient to support convictions. After noting that Kyer "preserve[d] [his] objection on the 4th Amendment issue," the trial court found Kyer guilty of the charged offenses.

## II. Analysis

On appeal, Kyer argues that the trial court erred in denying his motion to suppress because: 1) the "community caretaker exception," as applied in the Commonwealth, does not extend to homes; 2) even were the "community caretaker exception" to apply, the officers lacked a "reasonable basis" upon which to believe that entry into the home was warranted; and 3) Kyer's mother's consent was "vitiated as a result of the illegal, warrantless entry." For the reasons that follow, we disagree.

We note first, that "[t]he burden to establish that the denial of the motion to suppress constituted reversible error

rests with the defendant." *King v. Commonwealth,* 39 Va. App. 306, 308, 572 S.E.2d 518, 519 (2002) (citations omitted).

At a hearing on a defendant's motion to suppress evidence allegedly obtained in violation of the Fourth Amendment, the defendant has the burden of establishing standing by proving that he had a reasonable expectation of privacy in the place searched, and the Commonwealth has the burden of proving that the relevant searches or seizures did not violate the defendant's Fourth Amendment rights.

*Jefferson v. Commonwealth,* 27 Va.App. 1, 10, 497 S.E.2d 474, 478 (1998) (citations omitted). Further, "[w]e are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them[,] and we give due weight to the inferences drawn from those facts by resident judges and local law enforcement officers." *McGee v. Commonwealth,* 25 Va.App. 193, 198, 487 S.E.2d 259, 261 (1997) (*en banc*) (citing *Ornelas v. United States,* 517 U.S. 690, 699, 116 S.Ct. 1657, 1663, 134 L.Ed.2d 911 (1996)). "However, we review *de novo* the trial court's application of defined legal standards such as probable cause and reasonable suspicion to the particular facts of the case." *Hayes v. Commonwealth,* 29 Va.App. 647, 652, 514 S.E.2d 357, 359 (1999).

It is axiomatic that the "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. United States District Court,* 407 U.S. 297, 313, 92 S.Ct. 2125, [2134,] 32 L.Ed.2d 752 (1972). And a principal protection against unnecessary intrusions into private dwellings is the warrant requirement imposed by the Fourth Amendment on agents of the government who seek to enter the home for purposes of search or arrest. *See Johnson v. United States,* 333 U.S. 10, 13–14, 68 S.Ct. 367, [368–69,] 92 L.Ed. 436 (1948). It is not surprising, therefore, that the [United States Supreme] Court has recognized, as "a 'basic principle of Fourth Amendment law[,]' that searches and seizures inside a home without a warrant are presumptively unreasonable." [*Payton v. New York,* 445 U.S. 573, 586, 100 S.Ct. 1371, [1380,] 63 L.Ed.2d 639 (1980)].

*Welsh v. Wisconsin,* 466 U.S. 740, 748–49, 104 S.Ct. 2091, 2097, 80 L.Ed.2d 732 (1984). Nevertheless, the Fourth Amendment protects people only from "unreasonable" searches and seizures. *See Elkins v. United States,* 364 U.S. 206, 222, 80 S.Ct. 1437, 1446–47, 4 L.Ed.2d 1669 (1960); *Verez v. Commonwealth,* 230 Va. 405, 410, 337 S.E.2d 749, 752 (1985). For that reason, the United States Supreme Court has carved out a few delineated exceptions to the warrant requirement. *United States District Court,* 407 U.S. at 318, 92 S.Ct. at 2137.

 One such exception, recognized by the United States Supreme Court and adopted by the courts of this Common-wealth, is known as the "emergency doctrine." *See Reynolds v. Commonwealth,* 9 Va.App. 430, 436–37, 388 S.E.2d 659, 663–64 (1990); *see also Mincey v. Arizona,* 437 U.S. 385, 98 S.Ct. 2408, 57 L.Ed.2d 290 (1978). This exception is described as a "reasonably perceived 'emergency' requiring immediate entry as an incident to the service and protective functions of the police as opposed to, *or as a complement to, their law enforcement functions." United States v. Moss,* 963 F.2d 673, 678 (4th Cir.1992) (emphasis added). Thus, because

> [t]he right of the police to enter and investigate in an emergency is inherent in the very nature of their duties as police officers[,][a] warrantless search during an emergency situation is "justified, if not required, by the fact that 'the preservation of human life is paramount to the right of privacy protected by search and seizure laws and constitutional guaranties [sic].' "

*Reynolds,* 9 Va.App. at 437, 388 S.E.2d at 664 (quoting *State v. Fisher,* 141 Ariz. 227, 686 P.2d 750, 761 (1984)) (other citations omitted) (applying emergency doctrine as type of exigent circumstance *permitting entry of residence* in course of investigating burglary and confirming safety of residents where police had already apprehended burglar who admitted prior entry into residence and noting "[a]mong the circumstances accepted as providing 'exigent circumstances' for a warrant-less search are those where a true 'emergency' exists").

Another exception to the warrant requirement is very similar to the emergency doctrine. That exception has become known as the "community caretaker doctrine." *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973). In *Cady,* the United States Supreme Court upheld a warrantless search of a trunk of a car that had been towed to a garage after an accident. 413 U.S. at 436–37, 93 S.Ct. at 2525–26. The Court noted that towing the car to the garage was "standard procedure" in that particular police department. *Id.* In affirming the reasonableness of the search, the Court recognized that:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature. Local police officers, unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, *may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute.*

*Id.* at 441, 93 S.Ct. at 2528 (emphasis added).

As this Court recognized in *Wood v. Commonwealth,* 27 Va.App. 21, 28, 497 S.E.2d 484, 487 (1998), the United States Supreme Court has yet to decide whether a warrantless intrusion into an individual's *home* may be supported by the community caretaker exception. Indeed, as Kyer accurately argues on appeal, we have likewise yet to decide if the community caretaker doctrine may apply to validate a warrantless entry into a home.[3] Nevertheless, we have applied

---

3. The Commonwealth contends on appeal that Kyer failed to raise this particular argument below and thus, that we are barred from consider-

the exception to uphold warrantless searches in the context of a search of an automobile. *See Williams v. Commonwealth,* 42 Va.App. 723, 731, 594 S.E.2d 305, 309 (2004); *Barrett v. Commonwealth,* 18 Va.App. 773, 778, 447 S.E.2d 243, 246 (1994), *reversed on other grounds,* 250 Va. 243, 462 S.E.2d 109 (1995). We have also extended this doctrine to permit warrantless searches of pedestrians or citizens that an officer reasonably believes are in distress or in need of assistance. *See Terry v. Commonwealth,* 23 Va.App. 87, 91, 474 S.E.2d 172, 174 (1996); *Commonwealth v. Waters,* 20 Va.App. 285, 289–90, 456 S.E.2d 527, 529–30 (1995).

We find it of no moment, however, that we have yet to apply the community caretaker exception in the context of a warrantless search of a home. Indeed, we find that in the context of a warrantless entry and search, little distinction has been made between the circumstances governing the application of the community caretaker doctrine and those governing the application of the emergency exception to the warrant requirement. *Compare Waters,* 20 Va.App. at 288–91, 456 S.E.2d at 529–30, *and Barrett,* 18 Va.App. at 776–79, 447 S.E.2d at 245–46, *with Reynolds,* 9 Va.App. at 436–37, 388 S.E.2d at 663–64, *and Shannon v. Commonwealth,* 18 Va.App. 31, 34–35, 441 S.E.2d 225, 226–27, *aff'd on reh'g,* 19 Va.App. 145, 449 S.E.2d 584 (1994).

 In fact, the only true distinction between these two doctrines is whether the search at issue related to a criminal investigation. In particular, as noted in *Moss,* the emergency doctrine may apply independent of investigatory functions, *or*

---

ing this issue pursuant to Rule 5A:18. However, as set forth above, Kyer clearly argued—albeit somewhat inartfully:

> The other issue, Your Honor, that I think is important to consider is that, you know, this is a residence. This isn't a car. This isn't some sort of thing where we have a lesser expectation of privacy. This is someone's home.

We thus find that Kyer properly preserved the issue for purposes of appeal. See *Lash v. County of Henrico,* 14 Va.App. 926, 929, 421 S.E.2d 851, 853 (1992) (en banc) (noting that Rule 5A:18, "does not prohibit reliance on statutes or cases not presented to the trial court to support, on appeal, a position otherwise adequately presented at trial").

it may apply as a "complement to [such] functions." *Moss,* 963 F.2d at 678. When applied as a "complement" to investigatory functions of the police, the emergency exception becomes subsumed within the doctrine of exigencies and must therefore, satisfy the requirements of warrantless entry under those circumstances. *See Commonwealth v. Thornton,* 24 Va.App. 478, 484, 483 S.E.2d 487, 490 (1997) (recognizing that "[a]mong the circumstances accepted as providing 'exigent circumstances' for a warrantless search are those where a true 'emergency' exists" (quoting *Reynolds,* 9 Va.App. at 436, 388 S.E.2d at 663)); *see also Hill v. Commonwealth,* 18 Va.App. 1, 3, 441 S.E.2d 50, 51 (1994) ("When probable cause exists, exigent circumstances excuse the requirement of obtaining a warrant, *but exigent circumstances do not excuse the requirement of probable cause.*" (emphasis added)).

However, when applied independently of police investigatory functions (in the "non-exigent" context), the emergency exception becomes the functional equivalent of that portion of the community caretaker doctrine recognizing that, independent from their duties of investigating crimes, "police owe 'duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis.'" *Reynolds,* 9 Va.App. at 436, 388 S.E.2d at 663 (quoting *Washington v. Bakke,* 44 Wash.App. 830, 723 P.2d 534, 536 (1986)). Nevertheless, unlike the hybrid nature of the emergency exception, the community caretaker exception may *only* apply to those circumstances "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady,* 413 U.S. at 441, 93 S.Ct. at 2528.[4]

For that reason, this Court has consistently required that any warrantless search, pursuant to either the community

---

4. The trial court implicitly recognized the similarity between these two doctrines in its ruling, "I do think that the community caretaker doctrine and/or exigent circumstances permitted their entry into the residence."

caretaker exception or the "non-exigent" form of the emergency exception, be factually unrelated to an intent to search for evidence of illegal activity. *See Reynolds,* 9 Va.App. at 438, 388 S.E.2d at 664 (applying the emergency exception and noting that "[n]o evidence in the record suggest[ed] that the [officers'] entry into appellants' house ... was a pretext to search for contraband or illegal activity rather than to look for possible victims and to secure the property," and finding that the officers "act[ed] in good faith under the circumstances and according to their responsibilities as law enforcement officers"); *compare Williams,* 42 Va.App. at 731, 594 S.E.2d at 309 (noting that a search, pursuant to impoundment of a vehicle and corresponding community caretaking functions, "must not be a pretextual surrogate for an improper investigatory motive"); *King,* 39 Va.App. at 310, 572 S.E.2d at 520; *Servis v. Commonwealth,* 6 Va.App. 507, 521, 371 S.E.2d 156, 163 (1988); *compare also Waters,* 20 Va.App. at 290, 456 S.E.2d at 530 (applying the community caretaker exception in the context of a police/pedestrian encounter and stating that "[t]he appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by," among other things, "whether ... the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function").

Accordingly, we find that any distinction between the two exceptions has been effectively eradicated in the Commonwealth. In fact, such eradication has erred on the side of the sanctity of individuals' Fourth Amendment privacy rights, by requiring, in every case, that police officers conducting warrantless searches pursuant to these exceptions do so independently of their criminal investigatory functions. In light of this, we find no reason to conclude that both doctrines, community caretaker and emergency, *given the appropriate circumstances,* should not extend to warrantless searches of homes.

As indicated above, an understanding of the policy issues concerned further supports our conclusion. The community caretaker doctrine, similar to the emergency exception to the

warrant requirement, is grounded in consideration of the fact that police officers owe "duties to the public, such as rendering aid to individuals in danger of physical harm, reducing the commission of crimes through patrol and other preventive measures, and providing services on an emergency basis." *Barrett*, 18 Va.App. at 778, 447 S.E.2d at 246 (quoting *Reynolds*, 9 Va.App. at 436, 388 S.E.2d at 663 (citation omitted)); *see also Wood*, 27 Va.App. at 33, 497 S.E.2d at 490 (Annunziata, J., dissenting). Indeed, it is far from illogical to expect that police officers, as a necessary function of their profession, do much more than simply "investigate" crimes or wrongs that have already occurred or that have unfolded in their presence. To the contrary,

> [p]olice have "complex and multiple tasks to perform in addition to identifying and apprehending persons committing serious criminal offenses;" by design or default, the police are also expected to "reduce the opportunities for the commission of some crimes through preventive patrol and other measures," "aid individuals who are in danger of physical harm," "assist those who cannot care for themselves," "resolve conflict," "create and maintain a feeling of security in the community," and "provide other services on an emergency basis."

3 W. LaFave, *Search and Seizure* § 6.6, at 389–90 (1996); *see also Wood*, 27 Va.App. at 33, 497 S.E.2d at 490 (Annunziata, J., dissenting). Thus, "police [often] have occasion to enter premises without a warrant for a variety of ... purposes." *Id.*

While we recognize that the factual circumstances supporting an application of the community caretaking function "used to uphold a *vehicle* search, such as existed in *Cady*, may not be sufficient to justify an intrusion into an individual's *home*," *Wood*, 27 Va.App. at 27, 497 S.E.2d at 487 (citing *Cady*, 413 U.S. at 439, 93 S.Ct. at 2527; and *South Dakota v. Opperman*, 428 U.S. 364, 367, 96 S.Ct. 3092, 3096, 49 L.Ed.2d 1000 (1976)) (noting the distinction in the privacy interests of a vehicle versus a residence) (emphases added), it is fundamental that police will have occasion to enter many types of "premises" for

the purpose of carrying out their community caretaking duties and that such other premises will necessarily include homes. In fact, under circumstances leading an officer to reasonably believe that an individual inside a home was in immediate need of his or her assistance, the officer would clearly be remiss if he or she refused to investigate the matter and/or offer that assistance, based solely on the fact that the individual was located within a home, versus a car or a public sidewalk. For these reasons, we hold that at least some form of the community caretaker exception, *in its narrowest sense,* must logically extend to the warrantless entry of homes.

 Our analysis, however, is not yet complete. We must now determine whether the circumstances presented in the case at bar were sufficient to warrant application of the community caretaker exception. The appropriateness of applying the community caretaker doctrine to a given factual scenario is determined by whether, based upon the totality of the circumstances, it was reasonable for the officer to believe that his or her actions were *necessary* for: "1) the protection of the owner's property while it remains in police custody, 2) the protection of police against claims or disputes concerning lost or stolen property, [or] 3) protection of the public and the police from physical danger." *Williams,* 42 Va.App. at 730, 594 S.E.2d at 309 (citing *Reese v. Commonwealth,* 220 Va. 1035, 1039, 265 S.E.2d 746, 749 (1980); *Opperman,* 428 U.S. at 373–76, 96 S.Ct. at 3099–3101; and *Cady,* 413 U.S. at 442–48, 93 S.Ct. at 2528–31); *see also Reynolds,* 9 Va.App. at 437, 388 S.E.2d at 664 ("Police officers are not required to possess either the gift of prophecy or the infallible wisdom that comes with hindsight. Their conduct in making a warrantless search must be judged by the circumstances confronting the officers at the time they act."). Specifically, factors to be considered are whether (1) the officer's initial contact or investigation is reasonable; (2) the intrusion is limited; and (3) the officer is not investigating criminal conduct under the pretext of exercising his community caretaker function. *Waters,* 20 Va.App. at 290, 456 S.E.2d at 530.

In the case at bar, evidence supported the trial court's implicit finding that each of these factors was satisfied. It is clear that Officer Davis and Detective Story were in the process of investigating a burglary when they arrived at Kyer's home. However, given the circumstances presented at the time the officers approached Kyer's front door, the officers' warrantless entry into the home was justified pursuant to the community caretaker exception. In particular, the burglary that the officers were investigating had occurred only a few hours before they arrived at Kyer's home. The officers arrived there at 4:00 a.m., a time when conditions were dark and rainy. Yet, the front door to Kyer's home stood open— wide enough so that the officers could walk through it without touching the door. No lights were on in the home, and no sounds were heard by the officers. As Detective Story testified, the officers announced their presence loudly, several times, and after receiving no answer they entered the home for the limited purpose of determining whether anyone was in the home and whether those persons were in need of assistance. We find no error in the trial court's determination that these officers, under the totality of the circumstances presented at the time, reasonably believed that persons in the home might be in need of immediate assistance and that their limited entry was necessary.

Further, the evidence in the record supports the trial court's factual determination that the officers' reason for entering the home was not pretextual and was unrelated to their initial purpose of investigating the burglary. Indeed, upon entering the home, the officers limited their search for persons inside the home who might be in need of assistance. Once they determined that no person was in need of assistance, they gathered in the living room with Kyer's mother and brother to explain the purpose for their presence. The officers did not proceed to search the home. In fact, it was only after the officers explained their presence to Kyer's mother that they *requested to search* the home for the stolen items. And, it was only after Kyer's mother granted her consent that the officers proceeded to search the home for the

items at issue. *See Schneckloth v. Bustamonte*, 412 U.S. 218, 222, 93 S.Ct. 2041, 2045, 36 L.Ed.2d 854 (1973) ("[A] search authorized by consent is wholly valid.").

Considering the totality of these circumstances—most importantly, the trial court's factual finding that the actions of the officers here were not pretextual—we find that the officers' warrantless entry into the residence was constitutionally permissible pursuant to the community caretaker exception to the warrant requirement. Because we have found the officers' initial entry into the home was lawful pursuant to the community caretaker exception, we need not address Kyer's alternative argument that his mother's consent was "vitiated as a result of the illegal, warrantless entry." [5] We, likewise, need not address the Commonwealth's contention, made during oral argument, that the trial court actually intended to base its holding on the "emergency doctrine," but mistakenly stated "community caretaker and/or exigent circumstances."

For the above-stated reasons, we affirm the judgment of the circuit court.

*Affirmed.*

---

5. Kyer's Statement of The Questions Presented frames this issue as whether the "trial court err[ed] in ruling that, even if the warrantless entry/search of the Appellant's residence was excepted under the community caretaking doctrine, the subsequent consent to search given by Appellant's mother was valid." In keeping with this argument, Kyer contended below, "I think another issue here, Judge, is whether or not under those circumstances a person can give a voluntary, uncoerced kind of consent." Nevertheless, in his brief on appeal, Kyer argued only that Kyer's mother's consent was invalid as a result of the initial "illegal" entry by the police officers. Kyer did not argue that the officers' entry into the home, regardless of its legality, necessarily affected the voluntary nature of his mother's consent. Thus, given that Kyer now argues on appeal only that the consent was the "fruit of the poisonous tree" of the "illegal" entry, and having found that the entry was proper under the community caretaker doctrine, we need not address the issue of the validity of the consent further.