#24853-aff in pt, rev in pt & rem-JKK

**2009 SD 99**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

STATE OF SOUTH DAKOTA,                           Plaintiff and Appellee,

    v.

BRIAN LEE DENEUI,                                Defendant and Appellant,

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT
OF THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

\* \* \* \*

HONORABLE GLEN A. SEVERSON

Judge

\* \* \* \*

MARTY J. JACKLEY
Attorney General

FRANK GEAGHAN
Assistant Attorney General                    Attorneys for plaintiff
Pierre, South Dakota                          and appellee.

MARK KADI
Minnehaha County Office of
  the Public Advocate                         Attorneys for defendant
Sioux Falls, South Dakota                     and appellant.

\* \* \* \*

CONSIDERED ON BRIEFS
ON FEBRUARY 17, 2009

OPINION FILED **11/10/09**

#24853

KONENKAMP, Justice

[¶1.] In a case of first impression, we are confronted with the question whether the community caretaker doctrine, which we previously applied to an automobile search, should also be applied to a home search. After smelling ammonia fumes outside a home, police officers entered without a warrant to see if anyone inside needed assistance. While in the home, they saw evidence of a methamphetamine lab in plain view, which later formed the basis for obtaining a search warrant. Defendant homeowner sought unsuccessfully to suppress the evidence seized in his house. He was convicted and sentenced on multiple charges related to the manufacture and possession of methamphetamine. On appeal, we conclude that, under the particular circumstances of this case, the officers were justified in their community caretaking function in entering the home to make sure no one had succumbed to noxious fumes. In another issue of first impression, we conclude that when a drug crime is committed at one location within two overlapping drug free school zones, such constitutes a single offense, and the constitutional prohibition against double jeopardy precludes dual convictions for both defendant's drug free school zone crimes. We affirm in part, reverse in part, and remand.

**Background**

[¶2.] On April 27, 2007, Roger Pieper of MidAmerican Energy was sent to investigate a potential gas leak at 510 East 31st Street, in Sioux Falls, South Dakota. It was not the first time the company had received complaints in recent days about gas fumes in the neighborhood. During his check of the residence,

-1-

Pieper's handheld gas detector registered the presence of a "heavier combustible" gas lying low on the basement floor. Pieper later testified that no level of combustible gas is safe because it may indicate that the source of the gas could be "real strong" somewhere else. But because natural gas is lighter than air, he believed that the fumes were not likely natural gas. He went outside to check nearby houses, and noticed a "stronger" odor of fumes at the house next door, 508 East 31st Street, defendant's residence. He smelled an ammonia odor. It was similar to the odors he smelled in other areas on the block. Upon further investigation at the 508 home, Pieper noticed that the MidAmerican padlock for the gas meter was open and pliers were lying on the ground. Pieper initially thought a MidAmerican employee was working on the meter. When he walked around the house, however, he noticed another meter lying on the ground. He then believed that he was dealing with a possible theft of gas. He contacted his supervisor at MidAmerican, and his supervisor called the billing department to learn of the status of service to 508 E. 31st Street. During the call, Pieper learned that service at 508 had been shut off for nonpayment and that the meters had been switched with one taken from a house on inactive status fifteen blocks away. MidAmerican contacted the police.

[¶3.] While Pieper waited for a MidAmerican billing representative and law enforcement officers to arrive, he checked homes on the western side of the block for possible gas leaks. As he proceeded down the block, Pieper saw a person leave in a car from the 508 house. He also saw another person leave in a pickup. When

Pieper returned to the residence, he noticed that the meter had been re-locked and shut off. He also noticed that the meter lying on the ground was gone.

[¶4.] Officer Peter Zimbelman of the Sioux Falls Police Department was the first to respond to 508 E. 31st Street to investigate the possible theft of gas. He activated his video camera to record the investigation, but the camera was in a fixed position in the patrol car, and thus, there is only an audio recording of what transpired. Pieper told Officer Zimbelman that he saw two people leave the residence. Officer Zimbelman asked if Pieper thought anyone was still inside. Pieper did not know. Officer Zimbelman saw that the glass storm door to the residence was closed but unlocked, and the main wooden door was wide open. "Because it was a wide open, unsecured house," Officer Zimbelman believed someone could still be inside. He testified that he detected a faint odor of ammonia while standing outside the front door. He knocked on the door but no one answered. A neighbor approached Officer Zimbelman and told him that the person living at 508 E. 31st Street was caught at Kmart buying Sudafed and was seen bringing a propane tank into the house. The neighbor also mentioned the presence of strange gas odors about the neighborhood and that MidAmerican had been called twice.

[¶5.] Officer Thaddeus Openhowski arrived on the scene. He did not take part in the conversations between Officer Zimbelman and Pieper. Rather, he walked the perimeter of the house. While in the backyard, he noticed a chest freezer with a clear plastic tube sticking out of it. He opened the freezer because he thought it looked unusual. The tube was connected outside the freezer to a garden sprayer type device and inside the freezer was a clear plastic bucket. The officer

also noted that the back door to the house was unlocked. After walking around the exterior of the house, Officer Openhowski joined Officer Zimbelman by the front door.

[¶6.] Officer Zimbelman opened the storm door and yelled inside, "Hello, Police. Anybody in here?" According to Officer Zimbelman, the faint odor of ammonia he previously smelled became stronger when he opened the door. They decided to enter the residence "to check to make sure nobody was incapacitated inside." Both officers had personally experienced the adverse affects of ammonia fumes years earlier when they were on the scene after a packing plant explosion. Officer Openhowski was "hit with it pretty hard" and knew that ammonia could "knock somebody out."

[¶7.] Once inside the home, the officers saw in plain view a propane tank. They also noticed that the house was in disarray. Within a minute after entry, Officer Zimbelman can be heard on the audio commenting on the real strong chemical odor. Finding no one upstairs, they went toward the staircase leading to the basement. At the entry of the staircase, both officers testified that the chemical odor became stronger. This caused Officer Zimbelman to believe that they might have encountered a methamphetamine lab. Officer Zimbelman called metro communications to contact Sergeant Jerry Mundt. Officers Zimbelman and Openhowski attempted to search the basement for persons possibly overcome by the fumes, but the fumes were overwhelming. They became light headed and had to leave the residence. The fire department and an ambulance were called. Officer Zimbelman received oxygen at the scene, and both officers later went to the

emergency room, where they were put on oxygen for two to three hours. No one was found in the house.

[¶8.] When Sgt. Mundt arrived, Officer Openhowski told him of the items he saw in the chest freezer. Sgt. Mundt opened the freezer to examine the contents. The officers also told Sgt. Mundt that during their entry to the basement they saw evidence of a possible methamphetamine lab. Sgt. Mundt contacted Detective Michael Walsh of the Minnehaha County Sheriff's Office to have a warrant prepared. Detective Walsh arrived at the scene but remained in his vehicle. Sgt. Mundt informed Detective Walsh of the contents of the freezer, the existence of the propane tank, that the tank had a blue discoloration consistent with the manufacture of methamphetamine, and of the items seen by Officers Openhowski and Zimbelman in the basement. Detective Walsh prepared an affidavit in support of the search warrant. A search warrant was executed and the homeowner, Brian Deneui (defendant), was later arrested. The search revealed a digital scale, methamphetamine pipes, a spoon and coffee filter that tested positive for methamphetamine, baggies, two wire strainers, one box of Sudafed PE, one baggie of white powder that tested positive for Ephedrine, lithium batteries, a forty-pound bag of Solar Salt, a snort tube, a propane tank, and a small baggie that tested positive for methamphetamine.

[¶9.] After defendant was arrested he was interviewed by Detective Walsh. Defendant admitted that he lived at 508 E. 31st Street. He also admitted to manufacturing methamphetamine for himself and his friends. Defendant was indicted on charges of (1) possession, distribution or manufacture of a controlled

substance; (2) manufacturing a controlled substance within 1000 feet of Patrick Henry Middle School; (3) manufacturing a controlled substance within 1000 feet of St. Mary's Catholic School; (4) possession of methamphetamine; and (5) maintaining a residence where controlled substances are used.

[¶10.] Defendant moved to suppress the evidence seized on the ground that his home was searched illegally. A hearing was held and the circuit court ruled that the officers' initial entry into the residence was lawful under the community caretaker exception to the warrant requirement. In regard to the search of defendant's freezer in the backyard, the court held that it was unlawful. After striking the information in the warrant affidavit related to the unlawful portion of the search, the court concluded that the affidavit contained sufficient information to support probable cause. Defendant was found guilty of all charges in a bench trial. He was sentenced to six years on the manufacturing charge, six years on each manufacturing charge within 1000 feet of a school, six years on the possession charge, and five years on the maintaining charge. The manufacturing sentence and one of the manufacturing within 1000 feet of a school sentences were to be served consecutively, with the remaining sentences to be served concurrently.

[¶11.] Defendant appeals on the grounds that (1) the court erred when it held that the officers' warrantless entry into the residence was lawful; (2) the search warrant lacked probable cause; (3) not all essential components in the manufacturing process were proved; (4) double jeopardy precludes two drug-free school zone convictions arising out of one manufacturing conviction from a single

location; (5) the evidence was insufficient to sustain guilty verdicts for possession of a controlled substance and maintaining a place where drugs are kept, sold, or used.

## I.
## Warrantless Entry into Home

[¶12.]     Both the Fourth Amendment of the United States Constitution and article VI, section 11 of the South Dakota Constitution protect citizens from unreasonable searches and seizures.  State v. Hess, 2004 SD 60, ¶11, 680 NW2d 314, 319.  Because defendant has not asserted and we have not found a basis to distinguish the protections afforded by the South Dakota Constitution from those provided by the federal constitution under the circumstances of this case, our analysis applies equally to both the state and federal constitutional provisions.  State v. Schwartz, 2004 SD 123, ¶31, 689 NW2d 430, 437-38 (Konenkamp, J., concurring in result).

[¶13.]     The Fourth Amendment does not protect against all searches and seizures, but only against unreasonable searches and seizures.  United States v. Sharpe, 470 US 675, 682, 105 SCt 1568, 1573, 84 LEd2d 605 (1985).  In deciding whether a search or seizure was reasonable, "[t]he touchstone of our analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'"  Pennsylvania v. Mimms, 434 US 106, 108-09, 98 SCt 330, 332, 54 LEd2d 331 (1977) (quoting Terry v. Ohio, 392 US 1, 19, 88 SCt 1868, 1878-79, 20 LEd2d 889 (1968)).  Reasonableness "depends on a balance between the public interest and the individual's right to personal security free from arbitrary interference by law officers."  United States v. Brignoni-Ponce, 422 US 873, 878, 95 SCt 2574, 2579, 45 LEd2d 607 (1975) (citations

omitted). On the other hand, "it is well established that 'searches and seizures inside a home without a warrant are presumptively unreasonable.'" *Hess*, 2004 SD 60, ¶22, 680 NW2d at 324 (citing Payton v. New York, 445 US 573, 586, 100 SCt 1371, 1380, 63 LEd2d 639, 651 (1980)). "'[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]'" *Id.* (quoting United States v. United States Dist. Court, 407 US 297, 313, 92 SCt 2125, 2134, 32 LEd2d 752 (1972)).

[¶14.]     Generally, "every law enforcement entry into a home for the purpose of search and seizure must be made with a warrant." *Id.* (citing Katz v. United States, 389 US 347, 357, 88 SCt 507, 514, 19 LEd2d 576 (1967); State v. Lamont, 2001 SD 92, ¶50, 631 NW2d 603, 617). A warrantless search and seizure is permissible only if it satisfies a specific exception to the warrant requirement. *Id.* The State bears the burden of establishing, by a preponderance of the evidence, that the warrantless search satisfied a specific exception. *Id.* ¶23; State v. Labine, 2007 SD 48, ¶14, 733 NW2d 265, 269. Constitutional challenges to a warrantless law enforcement search require a two-step inquiry: first, factual questions on what the officers knew or believed at the time of the search and what action they took in response; second, legal questions on whether those actions were reasonable under the circumstances. *Hess*, 2004 SD 60, ¶23, 680 NW2d at 324-25; *Lamont*, 2001 SD 92, ¶50, 631 NW2d at 617 (Amundson, J., dissenting) (citing State v. Meyer, 1998 SD 122, ¶23, 587 NW2d 719, 724 (citing State v. Heumiller, 317 NW2d 126, 129 (SD 1982)). Although we defer to the circuit court's fact findings, it is our duty to make our own legal assessment of the evidence to decide under the Fourth Amendment whether

the officers' actions were "objectively reasonable." State v. Nguyen, 2007 SD 4, ¶12, 726 NW2d 871, 875; *Lamont*, 2001 SD 92, ¶21, 631 NW2d at 610. The legality of a search will not depend on the motivations of the police officers involved in the search. *Lamont*, 2001 SD 92, ¶21, 631 NW2d at 610. Indeed, any asserted inconsistencies in an officer's actions, supposedly evincing subjective intentions or beliefs about the situation, are irrelevant to the objective assessment of whether the actions were reasonable. State v. Simmons, 714 NW2d 264, 274 (IA 2006).

### 1. Exigent Circumstances Exception

[¶15.] We first examine the exigent circumstances exception to the warrant requirement because that is the exception the State contends applies in this case. The exigent circumstances exception is widely recognized and has been consistently applied by this Court. Probable cause and exigent circumstances analysis pertains only when law enforcement officers are investigating criminal activity. United States v. Quezada, 448 F3d 1005, 1007 (8thCir 2006); People v. Davis, 497 NW2d 910, 920 (Mich 1993). For this exception to apply, law enforcement officers must possess probable cause that the premises to be searched contains the sought-after evidence or suspects. *Quezada*, 448 F3d at 1007; *Davis,* 497 NW2d at 920.

[¶16.] This Court's test for whether exigent circumstances exist asks "whether police officers, under the facts as they knew them at the time, would reasonably have believed that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of a suspect's escape." *Hess*, 2004 SD 60, ¶25, 680 NW2d at 325 (citation omitted). "If the officer is not executing a valid search warrant, a warrantless search and seizure

is unreasonable absent probable cause and exigent circumstances." Swedlund v. Foster, 2003 SD 8, ¶42, 657 NW2d 39, 56 (citations omitted).

[¶17.]     Before we consider whether exigent circumstances existed, we must first decide whether the officers were acting in their crime investigation capacity when they entered defendant's home. *See Quezada*, 448 F3d at 1007; *Davis*, 497 NW2d at 920. Both officers testified that they did not enter the home because they believed that methamphetamine was being manufactured there. Rather, they entered because they smelled ammonia fumes and wanted to make sure no one was endangered inside. Officers Zimbelman and Openhowski were found credible by the circuit court. Officer Openhowski maintained that before entering he had no clue that the house could contain a methamphetamine lab and was not intending to investigate a possible methamphetamine lab despite the fact that he saw the freezer with tubing while outside the back of the house. Officer Zimbelman similarly insisted that although the neighbor told him that defendant had been caught buying Sudafed, Zimbelman did not suspect a methamphetamine lab until after he was inside the residence. Both officers testified that they had not worked in narcotics during their careers and they had had little training in drug investigation.

[¶18.]     Unlike *Hess*, where we held that exigent circumstances warranted the intrusion when the officers were at a house to execute an arrest warrant and observed, through a window, two persons consuming what appeared to be a controlled substance, here the circuit court found that the officers entered the house in their non-investigatory capacity to make sure no one inside was overcome by ammonia fumes. *See* 2004 SD 60, ¶2, 680 NW2d at 317. The officers neither

observed nor suspected that a crime was being committed inside the home and there were no claims by the officers, or findings adopted by the court, that support an entry based on the presence of a possible active methamphetamine lab. *See* United States v. Walsh, 299 F3d 729 (8thCir 2002) (intrusion warranted because of active methamphetamine lab). We also find distinguishable the "plain smell" cases the State cites to argue that the smell of an odor alone is sufficient to provide probable cause. Here, the officers did not believe that the smell of ammonia meant that a possible crime was being committed, i.e. the presence of an active methamphetamine lab. Because the officers did not enter the house in furtherance of a criminal investigation, the sole fact that the officers smelled ammonia cannot give rise to the application of the exigent circumstances exception.

## 2. Aiding Persons in Need of Assistance Exceptions

[¶19.]     The exigent circumstances exception to the warrant requirement encompasses police entry for the purpose of arresting persons thought to be within or for the purpose of finding the fruits, instrumentalities, or evidence of a past crime. That exception, as we have concluded, does not apply in this case. Courts also recognize, however, several exceptions to the warrant requirement where police entry is not for the purpose of investigating crime but for the purpose of preserving life or property.

[¶20.]     Here, the circuit court held that the officers' initial entry into defendant's home was lawful under the community caretaker exception to the warrant requirement. This Court adopted the exception in *State v. Rinehart*, a case where an officer stopped a vehicle after becoming concerned that the driver might

be experiencing a medical emergency. 2000 SD 135, ¶¶7-10, 617 NW2d 842, 843-44. Because here the officers smelled a chemical odor while standing outside defendant's residence, the court found that the "overwhelming purpose of the officers in entering the house was to search for possible victims of the fumes." Defendant claims that the initial warrantless entry was unlawful because the officers used a well-being check as a pretext for gathering evidence of a crime and there was no emergency justifying the warrantless entry.

[¶21.]     The United States Supreme Court and multiple other courts have upheld a police officer's authority to enter a residence without a warrant when there is a reasonable belief that someone is in need of immediate aid. Mincey v. Arizona, 437 US 385, 392, 98 SCt 2408, 2413, 57 LEd2d 290 (1978). What has not been consistent, however, is which exception to the warrant requirement will permit an officer's warrantless entry into a residence under these circumstances. A review of the caselaw reveals a breadth of decisions discussing and applying various exceptions including the emergency doctrine, the emergency aid doctrine, and the community caretaker doctrine.

[¶22.]     Some of the avowed distinctions between these three doctrines can be frail, bordering on the meaningless. Neither have they been consistently applied, thus creating contradictory and sometimes conflicting doctrines. Some courts treat these exceptions interchangeably. Others declare that the community caretaker exception applies, but then use law applicable to one of the other exceptions, such as the emergency doctrine. Several courts have also held that the emergency aid doctrine is a subcategory of the community caretaker exception, while the

emergency doctrine is a subcategory of the exigent circumstances exception. We will examine each exception and then determine whether, under the facts of this case, the warrantless entry into defendant's home was justified under any of the exceptions. We are not bound by the circuit court's legal conclusion about which exception, if any, applies. *See Hess*, 2004 SD 60, ¶9, 680 NW2d at 319; State v. Herrmann, 2002 SD 119, ¶9, 652 NW2d 725, 728.

### a. Emergency Doctrine

[¶23.]     The emergency doctrine, allowing warrantless entry into a home, has been specifically adopted and applied by the United States Supreme Court. *Mincey*, 437 US at 392-93, 98 SCt at 2414, 57 LEd2d 290. In *Mincey*, the Court noted that "[n]umerous state and federal cases have recognized that the Fourth Amendment does not bar police officers from making warrantless entries and searches when they reasonably believe that a person within is in need of immediate aid." *Id*. More specifically, the Court stated that "[t]he need to protect or preserve life or avoid serious injury is justification for what would be otherwise illegal absent an exigency or emergency." *Id*. (citation omitted). Relying on *Mincey*, a majority of courts have similarly adopted the emergency doctrine exception.[1]

---

1.     *See* United States v. York, 895 F2d 1026, 1029 (5thCir 1990); United States v. Stafford, 416 F3d 1068, 1073-74 (9thCir 2005); *Quezada,* 448 F3d at 1007; Hotrum v. State, 130 P3d 965, 968 (AlaskaCtApp 2006); State v. Fisher, 686 P2d 750, 760-61 (Ariz 1984); State v. Fausel, 953 A2d 891, 896 (ConnCtApp 2008); People v. Meddows, 427 NE2d 219, 222 (IllCtApp 1981); Commonwealth v. Snell, 705 NE2d 236, 242-43 (Mass 1999); People v. Davis, 497 NW2d 910, 920 (Mich 1993); State v. Lemieux, 726 NW2d 783, 787 (Minn 2007); State v. Ryon, 108 P3d 1032, 1039-40 (NM 2005); Duquette v. Godbout, 471 A2d 1359, 1362 (RI 1984); Kyer v. Commonwealth, 601 SE2d 6, 12 (VaCtApp 2004).

[¶24.] One of the most common tests applied for this exception by both state and federal courts was developed by the New York Court of Appeals in *People v. Mitchell*, 347 NE2d 607, 609 (NY 1976).[2] The three-part *Mitchell* test requires:

> (1) The police must have reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property.
>
> (2) The search must not be primarily motivated by intent to arrest and seize evidence.
>
> (3) There must be some reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched.

*Id.* This test has been subject to much criticism and has been abrogated in part by the Supreme Court in *Brigham City v. Stuart*, 547 US 398, 402, 126 SCt 1943, 1947, 164 LEd2d 650 (2006). The criticism arose because the second prong delves into the officer's subjective motivations. In recent years, the United States Supreme Court has consistently held that only objective reasonableness is required to support a warrantless entry. In *Brigham*, it made this requirement clear: an officer's subjective motivation will not invalidate an otherwise reasonable search. *Id.* at 404, 126 SCt at 1947, 164 LEd2d 650. Therefore, some courts have modified the *Mitchell*

---

2. *See York*, 895 F2d at 1029; *Stafford*, 416 F3d at 1073-74; Guererri v. State, 922 A2d 403, 406 (DelSupCt 2007); State v. Blair, 62 P3d 661, 665 (KanCtApp 2002); State v. Resler, 306 NW2d 918 (Neb 1981) (adopting the *Mitchell* test, but concluding that exigent circumstances apply); People v. Smith, 609 NE2d 750, 755 (IllCtApp 1992); *Lemieux*, 726 NW2d at 787; Smith v. State, 419 So2d 563 (Miss 1982), *overruled on other grounds* Willie v. State, 585 So2d 660 (Miss 1991); *Ryon*, 108 P3d at 1039-40; State v. Gill, 755 NW2d 454, 460 (ND 2008); State v. Mountford, 769 A2d 639, 643-44 (Vt 2000), *abrogated in part by* Brigham City v. Stuart, 547 US 398, 402, 126 SCt 1943, 1947, 164 LEd2d 650 (2006); *see also* 3 Wayne R. LaFave, *Search & Seizure: A Treatise on the Fourth Amendment* 6.6 (3ded 1996).

test to require only an objective analysis. [3] *See* State v. Gill, 755 NW2d 454, 460 (ND 2008).

[¶25.]     Massachusetts applies its own test for the emergency doctrine. It only requires that "there were reasonable grounds for the . . . police to believe (an objective standard) that an emergency existed." *Snell*, 705 NE2d at 243 (citation omitted). No subjective considerations are reviewed. While Rhode Island similarly does not consider an officer's subjective intentions, it imposes a more demanding test. *Duquette*, 471 A2d at 1362. Rhode Island requires that, first, "the responding officer [must] have a reasonable belief that his assistance is required to avert a crisis;" second, "there must be a legitimate need for the performance of the search;" third, "the search must be 'carefully tailored' to render only the perceived need for help and should not extend any further;" fourth, in determining whether an 'emergency' existed, consideration must be given to "whether the purpose of the

---

3.     Other courts, however, still consider an officer's subjective motivations, whether using the *Mitchell* test or through the use of a different test. For example, a New Mexico court analyzed the subjective/objective dichotomy and concluded that the "ultimate issue is whether officers had a reasonable concern that an individual's health would be endangered by a delay, and in fact were motivated by a need to address that concern." *Ryon*, 108 P3d at 1046. The subjective element was adopted, according to the court, "because, in the absence of a warrant, a neutral magistrate has not provided a preliminary review," the exception "is a narrow one, [and] courts must closely scrutinize the actions and motives of the police in order to determine whether the exception applies." *Id*. Wisconsin also reviews the officer's subjective motivation, although with a different test. State v. Kraimer, 298 NW2d 568, 573 (Wis 1980) (citing State v. Prober, 297 NW2d 1 (Wis 1980)). Wisconsin employs a two-step analysis: "First, the search is invalid unless the searching officer is actually motivated by a perceived need to render aid or assistance. Second, even though the requisite motivation is found to exist, until it can be found that a reasonable person under the circumstances would

(continued . . .)

search would have been frustrated if the officers had been required to obtain a warrant;" and fifth, "the intrusion [must] not be a pretext to make an arrest or search to seize evidence." *Id.* (citations omitted).

[¶26.]     The emergency doctrine appears to be the exception most consistently applied.  This doctrine, as applied to a warrantless search of a home, has support of the United States Supreme Court, unlike the community caretaker exception. While the Supreme Court has not declared precisely what standard or test should be used to gauge the reasonableness of a warrantless intrusion under the emergency doctrine, it is clear that the Court will not inquire into an officer's subjective intentions.

[¶27.]     To adhere to Fourth Amendment principles while allowing officers to protect the public in emergencies, we adopt the following test for the emergency doctrine exception to the warrant requirement:  (1) there must be grounds to believe that some kind of emergency exists that would lead a reasonable officer to act; and (2) the officer must be able to point to specific and articulable facts, which if taken together with rational inferences, reasonably warrant the intrusion.

### b. Emergency Aid Doctrine

[¶28.]     There are considerable similarities between the emergency aid doctrine and the emergency doctrine, and perhaps the distinctions are too fine to merit separate treatment.  Nonetheless, several courts have adopted and applied

_____

(. . . continued)
  have thought an emergency existed, the search is invalid." *Id.*  Therefore,
  "[b]oth the subjective and objective test must be met." *Id.*

this exception to the warrant requirement, distinct from the community caretaker exception. Other courts treat the emergency aid doctrine interchangeably with the emergency doctrine. Hotrum v. State, 130 P3d 965 (AlaskaCtApp 2006) (declaring the emergency aid doctrine to be "well-recognized," yet applying the test for the emergency doctrine); State v. Fisher, 686 P2d 750 (Ariz 1984) (terming the exception as the emergency aid doctrine, yet applying the emergency doctrine test); *Ryon*, 108 P3d at 1039-40 (arguably applying the emergency doctrine, although termed the emergency assistance doctrine).

[¶29.]      Utah emphasizes that the emergency aid doctrine should be "strictly circumscribed" because the exception takes a "significant departure" from "Fourth Amendment jurisprudence by requiring neither a warrant nor probable cause as a prerequisite to a search." State v. Comer, 51 P3d 55, 62 (UtahCtApp 2002). Utah adopted a three-part test for the emergency aid doctrine.[4] New Hampshire similarly adopted a three-part test, which does not differ considerably from the test

---

4.      Utah's test requires:

>   (1) Police have an objectively reasonable basis to believe that an emergency exists and believe there is an immediate need for their assistance for the protection of life.
>
>   (2) The search is not primarily motivated by intent to arrest and seize evidence.
>
>   (3) There is some reasonable basis to associate the emergency with the area or place to be searched. That is, there must be a connection with the area to be searched and the emergency.

Salt Lake City v. Davidson, 994 P2d 1283, 1287 (UtahCtApp 2000).

for the emergency doctrine, but is nevertheless a distinct test.[5] State v. Macelman, 834 A2d 322, 326 (NH 2003) (quoting *Mitchell*, 347 NE2d at 609).

[¶30.] The Colorado Supreme Court also adopted an independent test for the emergency aid doctrine, which requires a "'colorable claim of an emergency threatening the life or safety of another.'" People v. Pate, 71 P3d 1005, 1011 (Colo 2003) (citation omitted). The court requires "the prosecution to prove the existence of 'an immediate crisis and the probability that [police] assistance will be helpful.'" *Id.* The test under the emergency aid doctrine, according to the Colorado court, is one of reasonableness requiring facts or circumstances showing that someone's life or safety is seriously threatened. *Id.*

[¶31.] In Michigan, "when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, their actions should be governed by the emergency aid doctrine, regardless of whether these actions can also be classified as community caretaking activities." *Davis*, 497 NW2d at 921. Michigan's version of the emergency aid doctrine allows police to "enter a dwelling without a warrant when they reasonably believe that a person within is in need of immediate aid." *Id.* However, the officers "must possess specific and articulable

---

5.	New Hampshire's test asks whether:

> (1) the police have objectively 'reasonable grounds to believe that there is an emergency at hand and an immediate need for their assistance for the protection of life or property'; (2) there is an objectively 'reasonable basis, approximating probable cause, to associate the emergency with the area or place to be searched'; and (3) the search is not 'primarily motivated by intent to arrest and seize evidence.'

*Macelman*, 834 A2d at 326 (quoting *Mitchell*, 347 NE2d at 609); *see also Mountford*, 769 A2d at 644.

facts that lead them to this conclusion. In addition, the entry must be limited to the justification therefor, and the officer may not do more than is reasonably necessary to determine whether a person is in need of assistance, and to provide that assistance." *Id.*

[¶32.]	From our review of these cases, it appears that the emergency aid doctrine differs from the community caretaker exception in part on the fact that the title, emergency aid doctrine, presumes an existing emergency to warrant the intrusion. Otherwise, this doctrine, like the community caretaker exception, requires reasonableness on the part of the officers and circumstances warranting the intrusion. We agree with those courts holding that no useful distinction can be made between the emergency doctrine and the emergency aid doctrine. Both require, at their essence, an emergency.

### c. Community Caretaker Doctrine

[¶33.]	The community caretaker exception has been recognized only in the context of automobiles by the United States Supreme Court. Cady v. Dombroski, 413 US 433, 441, 93 SCt 2523, 2528, 37 LEd2d 706 (1973). In *Cady*, the defendant's car was disabled as a result of a car accident and was later impounded. The defendant told law enforcement officers that he was a Chicago police officer. Because the officers knew defendant was required to carry his service revolver at all times, they subjected the car to an inventory search while it was impounded. The search revealed several bloody items, which later led the officers to the location of a dead body.

[¶34.]     In considering whether the defendant's Fourth Amendment rights were violated when his vehicle was impounded, the Supreme Court emphasized the constitutional difference between homes and cars. *Id.* at 439-40, 93 SCt at 2527, 37 LEd2d 706 (quoting Chambers v. Maroney, 399 US 42, 52, 90 SCt 1975, 1981, 26 LEd2d 419 (1970)). The Court also reiterated that "[t]he ultimate standard set forth in the Fourth Amendment is reasonableness." *Id.* at 439, 93 SCt at 2527, 37 LEd2d 706. With the reasonableness standard and constitutional difference in mind, the Court held that the police legally impounded the vehicle. The basis for allowing the warrantless seizure was that police officers "for want of a better term," can investigate an accident without a warrant in what "may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 SCt at 2528, 37 LEd2d 706.

[¶35.]     Following the Supreme Court's lead, many jurisdictions have adopted the community caretaker exception when police impound a vehicle, conduct an inventory search of an impounded vehicle, or, as in South Dakota, stop a vehicle for a well-being check when there is a "demonstrable reason to believe that a driver may be unfit to drive for medical or other reasons[.]"[6] *See Rinehart*, 2000 SD 135,

---

6.     *See also* United States v. Griffin, 729 F2d 475, 480-81 (7thCir 1984) (impoundment); Marsh v. State, 838 P2d 819, 820 (AlaskaCtApp 1992) (car appeared to be stalled); People v. Luedemann, 857 NE2d 187, 208 (Ill 2006) (no seizure for well-being check of person in vehicle); Kozak v. Comm'r of Public Safety, 359 NW2d 625, 628 (MinnCtApp 1984) (duty of police officer to determine if person is in need of assistance); State v. Washington, 687 A2d 343, 344 (NJSuperCt 1997); State v. Marcello, 599 A2d 357, 358 (Vt 1991); State v. Johnson, 546 NW2d 580 (WisCtApp 1996) (unpublished).

¶¶7-10, 617 NW2d at 843-44. With *Rinehart*, an automobile case, being our only previous community caretaker decision, the present case poses a significant expansion of the community caretaker doctrine. In several other jurisdictions, this exception has not easily evolved into an exception applicable to homes. In fact, the Seventh, Tenth, and Eleventh Circuits, as well as North Dakota, have declined to extend the community caretaker exception to residential entries because the *Cady* decision stressed the distinction between vehicles and dwellings.[7] These courts wish to maintain the constitutional distinction between "cars and homes" in applying this exception. *See Cady*, 413 US at 439-40, 93 SCt at 2527, 37 LEd2d 706.

[¶36.] Since, under the Fourth Amendment, the highest measure of protection is in the home, we must determine whether the warrantless entry into defendant's home under the facts of this case is an appropriate expansion of the community caretaker doctrine. Many courts have extended the community caretaker exception to the entry of a home.[8] But these decisions reveal how

---

7. United States v. Pichany, 687 F2d 204, 209 (7thCir 1980); United States v. Bute, 43 F3d 531, 535 (10thCir 1994); United States v. McGough, 412 F3d 1232 (11thCir 2005); *Gill*, 755 NW2d at 459.

8. *See* United States v. Nord, 586 F2d 1288, 1289 (8thCir 1978) (emergency features existed because of drunk person); *York*, 895 F2d at 1030 (applied emergency doctrine, but noted that the officers were exercising their community caretaking function); United States v. Rohrig, 98 F3d 1506 (6thCir 1996) (warrantless entry into home under community caretaker exception to abate a nuisance); People v. Ray, 981 P2d 928, 937 (Cal 1999); State v. Hoth, 718 A2d 28, 34-35 (ConnCtApp 1998) (applied emergency exception, but recognized that such was rooted in the community caretaking function of law enforcement); State v. Crawford, 659 NW2d 537 (Iowa 2003) (although the case involved a vehicle, court recognized search of home as part

(continued . . .)

inconsistently the exception has been applied.[9]  No single test has been adopted by a majority of courts.  For example, in California the exception arises when "[g]iven the known facts . . . a prudent and reasonable officer [would] have perceived a need to act in the proper discharge of his or her community caretaking functions."  People v. Ray, 981 P2d 928, 937 (Cal 1999), *cert. denied* Ray v. California, 528 US 1187, 120 SCt 1240, 146 LEd2d 99 (2000).  Wisconsin developed a three-part test, with a four-part subtest, that asks whether there was a seizure, whether the police action was a bona fide community caretaking activity, and whether the public's need and interest outweigh the intrusion upon the individual's privacy.  State v. Ziedonis, 707

---

(. . . continued)

of an officer's community caretaking duty under the emergency aid doctrine); State v. Blair, 62 P3d 661 (KanCtApp 2002) (applied emergency doctrine, but explicitly stated that the doctrine applies when officers are acting in the community caretaking function); State v. Alexander, 721 A2d 275, 285 (MdCtApp 1998) (applying a reasonableness standard in assessing whether the police were acting in their community caretaking function); *Davis*, 497 NW2d at 920 (recognizing the community caretaker exception); *Lemieux*, 726 NW2d at 787 (recognized that as part of their community caretaking function police may enter a home without a warrant to render emergency assistance); State v. Garbin, 739 A2d 1016, 1018-19 (NJSuperCt 1999) (warrantless entrance into a garage permitted under community caretaker exception); State v. Christenson, 45 P3d 511 (OrCtApp 2002) (statute specifically recognizes the community caretaker exception, although the facts did not warrant its application); Laney v. State, 76 SW3d 524 (TexCtApp 2002) (applying community caretaker exception); State v. Ziedonis, 707 NW2d 565, 570 (WisCtApp 2005).

9.    The dissent suggests that the cases cited do not stand for the propositions asserted.  As we stated, courts often mix use of language applicable to the emergency doctrine, emergency aid doctrine, and community caretaker exception.  Despite the mix of use, the cases cited recognize that the officers were acting as part of their community caretaking function, permitting the warrantless entry.

NW2d 565, 570 (WiscCtApp 2005) (quoting State v. Anderson, 417 NW2d 411, 414 (WisCtApp 1987) (automobile case)).

[¶37.] Texas does not require specific, objective, and articulable facts supporting the intrusion, but instead asks "(1) whether immediate government action was required; (2) whether the government interest was sufficiently compelling to justify a warrantless intrusion; and (3) whether the citizen's expectation of privacy was diminished in some way." Laney v. State, 76 SW3d 524, 529 (TexCtApp 2002) (citing *Rohrig*, 98 F3d at 1523). Texas adopted its test after examining two non-community caretaking doctrine cases from the Fifth and Sixth Circuits.

[¶38.] Although the above courts have adopted specific tests for this exception, there are courts applying the community caretaker exception but using a test applicable to the emergency doctrine or the emergency aid doctrine.[10] In

---

10. *See Stafford*, 416 F3d at 1073-74 (alternatively termed the community caretaking function or emergency exception, but application of the emergency doctrine test); *Hoth*, 718 A2d at 34 (emergency doctrine, according to the court, is rooted in the community caretaking function of police); *Blair*, 62 P3d at 665 (used test for emergency doctrine); *Alexander*, 721 A2d at 283-84 (emergency aid used interchangeably with community caretaking); *Lemieux*, 726 NW2d at 787 (recognized that in pursuing their community caretaking functions law enforcement can enter a home to render emergency assistance, but applied the emergency doctrine test); *Garbin*, 739 A2d at 1018-19 (acknowledged community caretaking function exception, but quote law for the emergency doctrine); State v. Christenson, 45 P3d 511 (OrCtApp 2002) (statutory community caretaking function exception is circumscribed by the parameters of the emergency aid doctrine); *see also York*, 895 F2d at 1029-30 (intrusion was reasonably foreseeable and officers were acting in their peacekeeping capacity). The emergency aid doctrine is most comparable to the community caretaker exception. In fact, one commentator has asserted that the emergency aid doctrine is a subcategory of the community caretaker exception. *See* Mary E. Naumann, *The Community Caretaker Doctrine: Yet*

(continued . . .)

particular, the Washington Supreme Court declared that the community caretaker exception in an automobile search case arises when an "'encounter made for noncriminal, noninvestigatory purposes is reasonable[.]'" State v. Kinzy, 5 P3d 668, 676 (Wash 2000) (citation omitted). Relying on this case, the Washington Court of Appeals extended the community caretaker exception to a home search. State v. White, 168 P3d 459, 466 (WashCtApp 2007). In *White*, however, the court applied the Washington Supreme Court's rule for the emergency aid doctrine. *See id.* (using *Kinzy's* three-part test for the emergency aid doctrine and not reasonableness test for the community caretaker exception). Maryland's test is also arguably the test for the emergency aid doctrine.[11]  *Alexander*, 721 A2d at 285.

[¶39.]      The Eighth Circuit applies the community caretaker exception. *See* United States v. Nord, 586 F2d 1288, 1289 (8thCir 1978); *Quezada*, 448 F3d at 1007. And the Eighth Circuit has made clear that an officer's subjective motivation is irrelevant to a determination whether the warrantless entry was justified. Some courts, on the other hand, specifically consider the subjective intentions of the officers conducting the search. *See Ziedonis*, 707 NW2d at 570; *White*, 168 P3d at

---

(. . . continued)

*Another Fourth Amendment Exception*, 26 AmJCrimL 325, 330-41 (1999); *see also Ray*, 981 P2d at 934; *Macelman*, 834 A2d at 325-26.

11.    In Maryland, an officer acts in his community caretaking capacity when "there were 'reasonable grounds to believe that some kind of an emergency existed,' that is, whether there is 'evidence which would lead a prudent and reasonable official to see a need to act.'" *Alexander*, 721 A2d at 285(emphasis removed) (this is also arguably the test for the emergency aid doctrine). However, "[t]he officer must 'be able to point to specific and articulable facts which, taken with rational inferences from those facts, reasonably warrant that intrusion.'" *Id.*

467. Several courts, recognizing the inconsistent application of the warrant requirement exceptions, have advocated new approaches by extinguishing some exceptions. For example, after a thorough analysis of the community caretaker, emergency aid, and exigent circumstances exceptions, a Michigan court held "that when the police are investigating a situation in which they reasonably believe someone is in need of immediate aid, their actions should be governed by the emergency aid doctrine, regardless of whether these actions can also be classified as community caretaking activities." *Davis*, 497 NW2d at 921 (emphasis added). The Virginia Court of Appeals, after recognizing the differences between the community caretaker exception and the emergency doctrine, similarly declared that "any distinction between the two exceptions has been effectively eradicated in the Commonwealth." *Kyer*, 601 SE2d at 12.

[¶40.] The Eighth Circuit case of *Quezada* provides a useful study. There, while serving papers and finding that no one answered the door, a deputy knocked on the door and though it was closed the latch was not engaged and the door swung open slightly. Through the gap in the door he saw lights on and heard a TV playing. He concluded that someone might be inside and that he or she was unable to respond. Once inside, the deputy found evidence of a crime. The court noted the "difference between the standards that apply when an officer makes a warrantless entry when acting as a so-called community caretaker and when he or she makes a warrantless entry to investigate a crime." 448 F3d at 1007. An officer acting "in ways totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of criminal law . . . may enter a residence without a

warrant [upon] a reasonable belief that an emergency exists requiring his or her attention." *Id.* (citations omitted). It is noteworthy, however, that the court concluded that the deputy entered the apartment "to investigate a *possible* emergency situation." 448 F3d at 1008 (emphasis added).

[¶41.]     From our review of the caselaw and scholarship on the community caretaker exception, we conclude that the constitutional difference between homes and automobiles counsels a cautious approach when the exception is invoked to justify law enforcement intrusion into a home.[12] Merely invoking a community caretaking purpose should not legitimize a search in a criminal investigation. Nonetheless, homes cannot be arbitrarily isolated from the community caretaking equation. The need to protect and preserve life or avoid serious injury cannot be limited to automobiles. And, indeed, as indicated above, in the totality of circumstances several courts have so held. *See, e.g.*, *Quezada*, 448 F3d at 1007. Taking the best insights from the diverse authorities dealing with this exception, several points bear consideration: the purpose of community caretaking must be the objectively reasonable independent and substantial justification for the intrusion; the police action must be apart from the detection, investigation, or acquisition of criminal evidence; and the officer should be able to articulate specific facts that, taken with rational inferences, reasonably warrant the intrusion. Another point gleaned from the caselaw is that the community caretaking function

---

12.     *See* Wayne R. LaFave, *A Treatise on the Fourth Amendment*, 3 Search & Seizure § 6.6 (4thed 2008); Debra Livingston, Police, *Community Caretaking, and The Fourth Amendment*, 1998 UChiLegalF 261; Matthew Bell, *Fourth*
                                                        (continued . . .)

is more akin to a health and safety check. This is an important distinction because the emergency doctrine and the emergency aid doctrine implicate, as their titles denote, actual emergencies.

### d. Application of Exceptions

[¶42.] Applying the three exceptions dealing with aiding persons in need of assistance to this case, we must decide whether the State met its burden of establishing, by a preponderance of the evidence, that the warrantless entry satisfied the emergency doctrine, the emergency aid doctrine, or the community caretaker doctrine. Concededly, this is a close question. On the one hand, there were few facts to lead the officers to believe that someone was inside defendant's home — no shouts from inside, no claims from neighbors that children, family, or roommates might be inside, and no observations of the officers of someone inside. If the warrant requirement is to retain its viability, a merely officious concern that someone might conceivably need assistance to avert some undefined peril should not justify police intrusion into a private dwelling. On the other hand, there are times when lives may be in jeopardy if officers hesitate to act in potentially hazardous situations, and the key question here is whether there were sufficient reasons to act. Or, as one court alternatively phrased it, the question is whether "the officers would have been derelict in their duty had they acted otherwise." *See*

_____

(. . . continued)
*Amendment Reasonableness: Why Courts Should Embrace the Community Caretaking Exception to the Warrant Requirement*, 10 BoaltJCrimL 3 (2005).

State v. Hetzko, 283 So2d 49, 52 (FlaCtApp 1973). And "[i]t must be emphasized that the fact that, as it turned out, no one was injured is of no moment." State v. Hedley, 593 A2d 576, 582 (DelSuperCt 1990).

[¶43.]    We find helpful the decision in *United States v. Cervantes*, 219 F3d 882 (9thCir 2000), overruled on other grounds by the United States Supreme Court's decision in *Brigham City*, 547 US 398, 126 SCt 1943, 164 LEd2d 650. There, a police officer was called to an apartment building to investigate a complaint by neighbors of a strong chemical odor. On arrival, the officer recognized the odor as coming from a chemical which, the officer knew, was sometimes used in the making of methamphetamine. Determining that the odor originated from a certain apartment, the officer looked through the window and saw three men inside a room with very little furniture. Knowing the risk of explosion, the officer pounded on the door and eventually caused the defendant to open the apartment door, at which point the chemical odor became much stronger. The officer entered the apartment and the three men fled. After the defendant was apprehended, the officer notified the apartment manager and assisted him in evacuating the other residents and turning off open flames. Then he entered the apartment and found a drug lab. *Cervantes*, 219 F3d at 890-91.

[¶44.]    The Ninth Circuit in *Cervantes* held that the search could be justified under the emergency doctrine, by which police are permitted to respond to emergencies as part of their community caretaking functions. *Id.* at 889. The analysis used in *Cervantes*, was later modified per *Brigham City*, to generate a two-prong test that asks whether (1) considering the totality of the circumstances, law

enforcement officers had an objectively reasonable basis for concluding that there was an immediate need to protect others or themselves from serious harm; and (2) the scope and manner of the search were reasonable to meet the need. *Id.* at 889. *See* United States v. Snipe, 515 F3d 947, 953 (9thCir 2008).

[¶45.]    Although we cannot definitively proclaim that the situation here matched the type of emergency in *Cervantes* — and for that reason the emergency doctrine and the emergency aid doctrine should not apply here — the odor of a noxious gas nonetheless merits further inquiry if police are to fulfill their roles as community caretakers. That leads us to another instructive opinion. In *Ray*, a plurality of the California Supreme Court ruled that the Fourth Amendment does not require a warrant or exigency to allow the admission of evidence discovered by police officers engaged in a community caretaking function. 981 P2d at 935. In that case, officers received a call reporting that the door at a certain address had been open all day and that the place was in shambles. They went to the residence and repeatedly knocked and announced their presence. No one answered. Concerned that someone inside might be injured, disabled, or unable to obtain help, the police entered the residence, conducted a seven-to eight-minute security check in which no interior doors or containers were opened, and observed in plain view drugs and money. Based on these observations they obtained a search warrant and seized evidence that led to defendant's prosecution for possessing controlled substances. Defendant, who owned the residence, moved to suppress.

[¶46.]    In examining the exceptions to the warrant requirement, the plurality in *Ray* ruled that because there were no facts to lead a reasonable officer to believe

that immediate entry was necessary to aid life or limb, the entry was not justified under the emergency aid doctrine. *Id.* at 934. Nonetheless, the entry was permissible under the community caretaker exception, as the officers were justifiably concerned that an injured person was inside the residence, rendering lawful the sighting of contraband in plain view. *Id.* at 938-39. Under the community caretaker exception, "circumstances short of a perceived emergency may justify a warrantless entry" to preserve life or protect property. *Id.* at 934. The appropriate standard is one of reasonableness: "Given the known facts, would a prudent and reasonable officer have perceived a need to act in the proper discharge of his or her community caretaking functions?" *Id.* at 937. The *Ray* court balanced the considerations regarding an officer's investigatory and non-investigatory capacities: in responding to a possible burglary, the function was, of course, "investigatory." With respect to the presumably innocent victims of possible crimes, where persons or property may be in danger, the police intervention was "non-investigatory." *Id.* at 937 n4.

[¶47.]	Here, the circuit court found that the officers' initial entry into defendant's home was justified, not as part of a criminal investigation, but in pursuance of their community caretaking function.[13] The court's findings of fact

---

13.	In its findings the court noted:

> It is true that Officer Zimbelman had some limited information that suggested the [D]efendant's involvement in drug activity, based upon the neighbor's report of an arrest for buying Sudafed at the Kmart. However, the court is satisfied, based upon all of the evidence presented, and based upon the credibility of the officers, beyond a reasonable doubt, that the overwhelming purpose of the officers in entering the house was to search for

(continued . . .)

are supported by the record. Neighbors had complained about strange gas odors on the block. The gas company had been called twice, and a company employee went to the area looking for a gas leak. The employee detected the presence of a "stronger" chemical odor in the vicinity of defendant's home. The police were summoned when it was discovered that the gas meter had been illegally switched at the defendant's house. The company employee told the officers of his discovery and of seeing two people leave the house. Both officers also smelled chemical fumes, which they identified as ammonia. One officer knocked on the front door of the house, but received no answer. In the meantime, the other officer walked around defendant's home and noticed a freezer with tubing extended from it. This appeared odd to the officer, so he opened the freezer, whereupon he saw another container inside. He also discovered that the back door was unlocked. Finding nothing else remarkable, he joined his fellow officer at the front of the house. A neighbor arrived at the scene and told one officer that defendant had been caught at Kmart buying Sudafed and was also seen bringing a propane tank into the house. The neighbor said that there had been strange gas odors in the neighborhood and the gas company had been called before.

[¶48.]     Shortly after gathering all this information, the officers knocked on defendant's front door again. They testified that when they were standing in front

_____

(. . . continued)

> possible victims of the fumes. These two police officers are experienced police officers, yet inexperienced with methamphetamine labs and their contents.

of the house they could smell the odor of ammonia.[14]  They decided "to check to make sure nobody was incapacitated inside."  The gas company employee did not know if there was anyone still in the home.  Based on the officers' detection of ammonia, a gas the officers knew from their personal experience was toxic, the citizen complaints about strange gas fumes in the area, the fact that the house was "wide open [and] unsecured," with the back door left unlocked and the front door left open, and only the storm door shut but unlocked, the officers decided to enter defendant's home.

[¶49.]        These circumstances presented a crucial moment of judgment for the officers.  Should they act to ensure no lives are in danger?  As many courts have acknowledged, "police officers are not only permitted, but expected, to exercise what the Supreme Court has termed 'community caretaking functions.'"  Winters v. Adams, 254 F3d 758, 763 (8thCir 2001) (quoting United States v. King, 990 F2d 1552, 1560 (10thCir 1993)).  Professor LaFave observed, "[d]oubtless there are an infinite variety of situations in which entry for the purpose of rendering aid is reasonable."  3 Wayne R. LaFave, *A Treatise on the Fourth Amendment*, 3 Search & Seizure § 6.6, p. 396-400 (3ded 1996).  Modern society has come to see the role of police officers as more than basic functionaries enforcing the law.  From first responders to the sick and injured, to interveners in domestic disputes, and myriad

---

14.    Officer Openhowski testified that Officer Zimbelman "said there was a strong odor."  However, Officer Zimbelman specifically testified at the suppression hearing that "when [he] came around the front and got towards the main door, the front door, [he] could smell a *faint* odor of ammonia or what appeared to be ammonia to [him]."  (Emphasis added.)  When he *opened* the

(continued . . .)

instances too numerous to list, police officers fulfill a vital role where no other government official can. Lives often depend upon their quick exercise of pragmatic wisdom. "Constitutional guarantees of privacy and sanctions against their transgression do not exist in a vacuum but must yield to paramount concerns for human life and the legitimate need of society to protect and preserve life." *Mitchell*, 347 NE2d at 611.

[¶50.] Indeed, these officers may have been justly criticized later had they failed to check for people inside and had an injured or dead person later been discovered. As Justice (then Judge) Warren Burger once wrote, "People could well die in emergencies if police tried to act with the calm deliberation associated with the judicial process." Wayne v. United States, 318 F2d 205, 212 (DCCir 1963). Although we cannot term the circumstances here an indisputable emergency, given the known facts, prudent and reasonable police officers would have reasonably perceived a need to act in the proper discharge of their community caretaking functions. "The touchstone of [] analysis under the Fourth Amendment is always 'the reasonableness in all the circumstances of the particular governmental invasion of a citizen's personal security.'" *Terry*, 392 US at 19, 88 SCt at 1878-79, 20 LEd2d 889; Florida v. Jimeno, 500 US 248, 250, 111 SCt 1801, 1803, 114 LEd2d 297 (1991). We think it was objectively reasonable under the particular circumstances of this case for the officers to be concerned about the possible dangers of ammonia fumes

---

(. . . continued)
door to yell inside, he testified that "the odor we had smelled outside that was faint became very strong at that point."

sufficient to permit them to enter the residence solely "to check to make sure nobody was incapacitated inside."

[¶51.]     It is noteworthy, though not necessarily persuasive, that police entries into residences for non-investigatory purposes have been upheld in arguably less serious circumstances. Under the community caretaker exception, courts have upheld police entry into apartments without a warrant after receiving complaints that water was leaking into the apartments below. *See* United States v. Boyd, 407 FSupp 693, 694 (SDNY 1976); State v. Dube, 655 A2d 338, 339 (Me 1995). In *Rohrig,* police responded to early morning complaints about excessive noise at the defendant's home. 98 F3d at 1519. As the police approached, they could hear loud music from a block away. After arriving at the house, the officers banged on the front door and tapped on the windows to no avail. Unable to rouse anyone inside after repeated pounding on doors and shouting to get someone's attention, two officers opened an unlocked screen door and went in. They found the stereo and turned down the volume. In the same room, they found Rohrig asleep. While in the home the officers also came upon "wall-to-wall" marijuana plants.

[¶52.]     Although characterizing the facts as fitting within the exigent circumstances exception, the Sixth Circuit reasoned that "[h]aving found that an important 'community caretaking' interest [abating a nuisance] motivated the officers' entry in this case," it concluded "that their failure to obtain a warrant does not render that entry unlawful." *Id.* at 1523. The court noted that the officers were not acting predominantly to enforce the law. Rather, they were acting for the purpose of abating a nuisance and restoring the neighbors' "peaceful enjoyment of

their homes and neighborhood." *Id.* at 1521. Using a reasonableness standard, the court determined that the Fourth Amendment's concerns in a criminal context are not implicated when police officers act to perform their community caretaking functions.[15]

[¶53.]     Rohrig himself, the court ruled, compromised his expectation of privacy by "projecting loud noises into the neighborhood in the wee hours of the morning" and then failing to respond to the officers. *Id.* at 1521-22. The officers in *Rohrig* faced a common community caretaking function: resolving a neighborhood dispute.[16] In our case, there had been complaints of strange gas odors in the

---

15.   Contrary to the dissent's assertion that *Rohrig* is applicable only to a nuisance abatement, *Rohrig* stands for the proposition that inquiry of whether a warrantless entry is reasonable is fact specific. Here, too, our holding is limited to its facts. The reasonableness of any intrusion depends on an examination of the totality of the circumstances. *Rohrig* involved a nuisance, but the rationale supporting officers' actions in a community caretaking capacity is not limited only to nuisance abatement. As the *Rohrig* court wrote:

> We do not lightly abrogate the constitutional presumption that police officers must secure a warrant before entering a private residence. In the end, however, we would find it extremely difficult to adjudge the conduct of the Canton police officers as "unreasonable" without pointing to *something* those officers should have done differently. Quite simply, we find nothing in the Fourth Amendment that leads us to disapprove of the officers' chosen course of action. Accordingly, we find that the officers acted reasonably under the totality of the circumstances they faced, and we therefore hold that their warrantless entry into Defendant's home did not violate the Fourth Amendment.

*Id.* at 1524-25.

16.   The dissent claims that *Rohrig* was limited by *United States v. Washington*, 573 F3d 279, 287-88 (6thCir 2009). While the court in *Washington* distinguished *Rohrig,* it did so because in *Washington* there was no threat of harm, creating a "true immediacy." *See id.* Here, however, the threat of

(continued . . .)

-35-

neighborhood. When the gas company responded, it was determined that the gas meter at defendant's home had been tampered with. Although the officers arrived initially in response to a possible theft, as the circuit court later found, the matter evolved into a legitimate community caretaking function that predominated over any criminal investigation: concern that someone inside the home may be in jeopardy from ammonia fumes. The probable source of the fumes was defendant's house, where both the officers and the gas company employee smelled ammonia fumes.

[¶54.] In pursuing their community caretaking purpose, the officers' initial intrusion was minimal. They cracked open the unlocked storm door to call inside, only then to discover that the smell of ammonia fumes became much stronger, thus warranting further inquiry. In the totality of circumstances, under the standard of objective reasonableness, we conclude that the circuit court did not err in ruling that the responding officers acted justifiably for the welfare of possible persons inside the residence. The officers adequately articulated their concerns, and their search in the house, lasting a matter of minutes, was limited to looking for people inside.[17] Therefore, under these particular facts, we conclude that the circuit

_____

(. . . continued)
    harm was obvious — ammonia fumes are deadly and it was unknown whether persons were inside who may have succumbed to the fumes.

17.    The *Rohrig* court made another observation that might well apply to our case:

       Even if we were to conclude that the officers' warrantless entry violated the Fourth Amendment, it could be argued that the suppression of evidence would not be warranted under the facts of this

                (continued . . .)

court's ruling should stand: the community caretaker exception applies to the warrantless entry into this home.[18]

## II.
## Search Warrant

[¶55.] The affidavit in support of the warrant was prepared by Detective Walsh. Detective Walsh did not enter defendant's home and did not see the evidence listed in the warrant. Rather, he was informed of the circumstances by Sgt. Mundt, who was not on the scene until after Officers Zimbelman and Openhowski exited the home. Sgt. Mundt relayed to Detective Walsh the information Officers Zimbelman and Openhowski gave him. Sgt. Mundt further

---

(. . . continued)

> case. Having determined that the officers acted reasonably, we do not believe that any legitimate deterrent function would be served by applying the exclusionary rule here. *Cf.* United States v. Leon*, 468 US 897, 918-19, 104 SCt 3405, 3418, 82 LEd2d 677 (1984) ("[E]ven assuming that the [exclusionary] rule effectively deters some police misconduct and provides incentives for the law enforcement profession as a whole to conduct itself in accord with the Fourth Amendment, it cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity.").

> 98 F3d at 1524 n10. *See also* Herring v. United States, __ US __, 129 SCt 695, 172 LEd2d 496 (2009) (exclusionary rule inapplicable to police mistakes leading to unlawful search not the result of systemic error or reckless disregard of constitutional requirements).

18. The flaw in the dissent's argument is that it fails to recognize the context under which the officers entered the home. This is evident in the dissent's claim that "there was no reason why the officers could not have secured the home and sought a search warrant." Of course they could have obtained a search warrant, but that entirely ignores the reason they entered the home without a warrant: to ensure that no one was in imminent danger from toxic fumes. Had there been anyone still inside, securing the home and waiting for a search warrant may have been too late for the occupants.

told Detective Walsh of his personal observations: a gas generator in the backyard and a propane tank in the house with what appeared to be blue discoloration. [19] It turned out the tank had no blue discoloration.

[¶56.]        Defendant argued at the suppression hearing that the blue discoloration statement was recklessly included in the affidavit and if excluded the affidavit would not have supported a finding of probable cause. The State averred that the statement, although incorrect, was not knowingly false or made in reckless disregard of the truth. The court agreed with the State and concluded that the statement about the blue discoloration was not deliberately false on the part of Detective Walsh. The court further found that the blue discoloration statement was not made on personal knowledge of the affiant, Detective Walsh. Therefore, the court held that "no suppression should result from this merely negligent observation, made under more stressful conditions."

[¶57.]        "We review the sufficiency of a search warrant 'by looking at the totality of the circumstances to decide if there was at least a "substantial basis" for the issuing judge's finding of probable cause.'" State v. Raveydts, 2004 SD 134, ¶7, 691 NW2d 290, 293 (citations omitted). We review the issuing judge's probable cause determination "independently of the conclusion reached by the suppression

---

19.    When Sgt. Mundt arrived on the scene, Officer Openhowski showed him the freezer he found in the backyard. Sgt. Mundt recognized the apparatus as a gas generator used in the making of methamphetamine. This information was included in the warrant, but after the suppression hearing the circuit court struck the statement about the gas generator. The court found that opening and viewing the freezer in defendant's backyard, without a warrant, was illegal. The State does not challenge this ruling.

hearing court." *Id.* (quoting State v. Boll, 2002 SD 114, ¶44, 651 NW2d 710, 721 (Konenkamp, J., concurring)). We also afford great deference to the issuing judge's probable cause determination, "'to further the Fourth Amendment's strong preference for searches conducted pursuant to a warrant.'" *Id.* ¶8 (citations omitted). "'[W]e will draw every reasonable inference possible in support of the issuing court's determination of probable cause to support the warrant.'" State v. Helland, 2005 SD 121, ¶17, 707 NW2d 262, 269 (citation omitted).

[¶58.] Normally, we only examine the four corners of an affidavit to review whether an affidavit in support of a search warrant shows probable cause for issuance of the warrant. *Id.* ¶17 (citations omitted). But when an affidavit is claimed to contain recklessly or intentionally false information, the affidavit is reviewed under the two-part test of *Franks v. Delaware*, 438 US 154, 98 SCt 2674, 57 LEd2d 667 (1978). State v. Dubois, 2008 SD 15, ¶13, 746 NW2d 197, 203. That test requires the defendant to "show by a preponderance of the evidence that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit. Second, the allegedly false statement must be necessary to the finding of probable cause." State v. Brings Plenty, 459 NW2d 390, 401 (SD 1990) (citation omitted).

[¶59.] Here, defendant has failed to establish that Sgt. Mundt's statement to Detective Walsh, which in turn Detective Walsh included in the affidavit, was made knowingly and falsely, or with reckless disregard for the truth. Sgt. Mundt testified that he walked around the exterior of the home with Officer Openhowski, at which time he peered through the window of the home and Officer Openhowski either

showed him the blue discoloration on the tank or Sgt. Mundt personally observed the blue discoloration. While there was no blue discoloration, Sgt. Mundt's testimony reveals a mere negligent or mistaken statement of that fact to Detective Walsh.[20] Therefore, we do not believe the court erred when it failed to excise the blue discoloration statement from the affidavit. In any event, the affidavit still supported a finding of probable cause, even without the blue discoloration statement.

### III.
### Manufacturing Conviction

[¶60.] Defendant was found guilty of manufacturing, distribution or dispensing of certain controlled substances as well as possession with the intent to manufacture or dispense in violation of SDCL 22-42-2. Defendant now claims that because not all the necessary components for the manufacture of methamphetamine

---

20. We find particularly problematic the court's reliance on *Rugendorf v. United States*, 376 US 528, 532, 84 SCt 825, 828, 11 LEd2d 887 (1964). In *Rugendorf,* the United States Supreme Court declined to find a Fourth Amendment violation when misstatements in an affidavit were of only peripheral relevancy and not within personal knowledge of the affiant. *Id.* Here, the court found compelling the fact that the blue discoloration was not within the personal knowledge of Detective Walsh. The State also emphasized that there was no deliberate falsehood on the part of Detective Walsh. We agree that the misstatement was not within Detective Walsh's personal knowledge; it came from Sgt. Mundt, who either obtained it personally or from one of the other officers. Nonetheless, Sgt. Mundt is not a *nongovernmental informant.* Detective Walsh must be imputed with personal knowledge of the facts obtained from Sgt. Mundt. Otherwise, the integrity of every affidavit could be shielded whenever an officer, without personal knowledge, obtains false information from an officer with personal knowledge. *Rugendorf* is inapplicable to this case, on the ground that the blue discoloration was more than peripherally relevant and was within personal knowledge of the affiant, by imputation from Sgt. Mundt and Officers Openhowski and Zimbelman.

were found or presented at trial, a conviction for manufacturing cannot be sustained. The State, on the other hand, argues that not every component of the manufacturing process needs to exist when the presence of multiple precursors and actual methamphetamine support the conviction.

[¶61.] We review a sufficiency of the evidence claim de novo. State v. Tofani, 2006 SD 63, ¶35, 719 NW2d 391, 400 (citation omitted). We will not reverse "the guilt determination of the trier of fact if we conclude that 'the State presented sufficient evidence on which the [court] could reasonably find the defendant guilty of the crime charged.'" Id. (citation omitted). Defendant was convicted after a trial to the court. The court issued findings of fact to support its guilt determination. In finding the defendant guilty under SDCL 22-42-2, the court listed the multiple items from defendant's residence that were seized and tested. The court further found Sgt. Mundt and the other officers credible. Sgt. Mundt testified that the items seized from defendant's home were used in the process of manufacturing methamphetamine. Moreover, although ammonia was not found, the court found credible the statements from Officers Openhowski and Zimbelman that they detected an odor of ammonia at the house and Sgt. Mundt's explanation that ammonia dissipates at a rapid rate. The court held that "it is clear that methamphetamine was manufactured by the defendant on or about the 25th day of April 2007 at 508 East 31st Street[.]" Defendant also admitted to manufacturing methamphetamine at his residence because he was addicted to it.

[¶62.] SDCL 22-42-1(6) defines "Manufacture," as "the production, preparation, propagation, compounding, or processing of a controlled drug or

substance, either directly or indirectly by extraction from substances of natural origin, or independently by means of chemical synthesis or by a combination of extraction and chemical synthesis." Based on defendant's confession that he manufactured methamphetamine, the presence of methamphetamine and multiple components of the manufacturing process, we believe the State presented sufficient evidence to support the court's finding of guilt under SDCL 22-42-2.[21] *See* Smith v. State, 3 SW3d 712, 715 (ArkCtApp 1999); State v. Brown, 820 P2d 878, 884 (OrCtApp 1991); *contra* State v. Avery, 2000 WL 1027287 n2 (IowaCtApp) (unpublished) (necessary ingredients missing, items possessed were legal, no finished product found, no evidence defendant knew how or had ever manufactured). We recognize that two components necessary to the manufacturing process were not entered into evidence: a gas generator and ammonia. The fact that these two components were missing, however, will not negate a finding of guilt. Rather, their absence is a circumstance to be considered and weighed with all the other evidence.

## IV.
## Double Jeopardy Prohibition

[¶63.]    Defendant was convicted of two violations of manufacturing a controlled substance, "[i]n, on, or within one thousand feet of real property comprising a public or private elementary or secondary school or a playground[.]"

---

21.    Defendant also claims that because there is no evidence linking him to manufacturing at a particular time, a conviction for manufacturing on or about April 25, 2007 cannot be sustained. Time is not a material element of the manufacturing charge, and therefore, the fact the crime may have been

(continued . . .)

SDCL 22-42-19(1); SDCL 22-42-2. Defendant was convicted twice because within 1000 feet of his residence were two schools and the State indicted defendant for two separate charges under SDCL 22-42-19(1). During closing arguments, defendant's counsel said that he did not believe that defendant could be convicted of both charges. Nonetheless, defendant was found guilty on both counts. During sentencing, however, counsel for the State and defendant discussed the two convictions. The prosecutor said that the State was not asking for consecutive time, and the court sentenced defendant concurrently on those charges.

[¶64.]        Defendant argues that he was punished twice for the same offense in violation of the double jeopardy clause. He contends that the Legislature did not intend to impose multiple punishments under the statute. According to defendant, because the evidence established one act of manufacturing at one location on a single date, he cannot suffer two convictions and two sentences arising from this one act of manufacturing. The State, on the other hand, asserts that the intent of the statute was to impose multiple punishments, as the statute is designed to protect youth from illegal drug use. Moreover, according to the State, defendant's multiple convictions under SDCL 22-42-19(1) required proof of some fact or element not required by the other: one school in one charge, and a different school in the second charge.

---

(. . . continued)

    committed on a different date is not fatal to the charge. *See* SDCL 23A-6-9; State v. Swan, 2008 SD 58, ¶12, 753 NW2d 418, 421.

[¶65.]      The Double Jeopardy Clause in the United States Constitution, Fifth Amendment, and the corresponding clause in the South Dakota Constitution, art VI, sec. 9, "shield criminal defendants from both multiple prosecutions and multiple punishments for the same criminal offense if the Legislature did not intend to authorize multiple punishments in the same prosecution."  State v. Dillon, 2001 SD 97, ¶13, 632 NW2d 37, 43.  "Established double jeopardy jurisprudence confirms that the Legislature may impose multiple punishments for the same conduct without violating the Double Jeopardy Clause if it clearly expresses its intent to do so."  *Id.* ¶14.  To assist in determining statutory intent, we apply the *Blockburger* test, which asks "whether each provision requires proof of an additional fact which the other does not."  *Id.* (citing Blockburger v. United States, 284 US 299, 304, 52 SCt 180, 182, 76 LEd 306 (1932)).

[¶66.]      A person violates SDCL 22-42-19(1) if that person "commits a violation of § 22-42-2 . . . [and] if such activity has taken place:  (1) In, on, or within one thousand feet of real property comprising a public or private elementary or secondary school or a playground[.]"  The statute, therefore, requires the State to prove a violation of a certain drug offense and that such violation took place within a certain distance of a school.  The statute does not declare an intent to impose multiple punishments when multiple schools are involved, but only multiple punishments when multiple qualifying crimes are involved.  Based on the plain reading of the statute, we conclude that the Legislature intended to impose one punishment for each violation under SDCL 22-42-2 that occurred within 1000 feet of a school.

[¶67.] Here, defendant was only convicted of one violation of SDCL 22-42-2, and therefore, could only be convicted of one violation of SDCL 22-42-19(1). It is immaterial that the court sentenced defendant to concurrent sentences for violating SDCL 22-42-19(1). Defendant suffered two convictions under SDCL 22-42-19(1) for the same conduct, a single act of manufacturing a controlled substance, in violation of the double jeopardy clause. We remand for entry of an order striking one of the convictions and its accompanying sentence.

## V.
## Maintaining and Possession Convictions

[¶68.] Defendant claims that the evidence was insufficient to sustain his conviction for maintaining "a place which was resorted to by persons using controlled substances for the purpose of using such substances, or which is used for the keeping and selling of such substances" in violation of SDCL 22-42-10 and that on or about April 25, 2007, he did knowingly possess a controlled substance in violation of SDCL 22-42-5. In regard to the possession charge, defendant maintains that because he was not in the residence when the methamphetamine was found, the State could not prove that he had dominion or control over the methamphetamine sufficient for possession. The State responds that because it proved that the utilities at the residence were in defendant's name, defendant lived at the residence alone, and the methamphetamine found inside the residence was subject to the dominion or control of defendant, the evidence was sufficient to prove the methamphetamine found was possessed by defendant.

[¶69.] A conviction under SDCL 22-42-5 requires proof that the defendant knowingly possessed a controlled substance. Here, defendant does not claim that he

did not know methamphetamine was in his home. In fact, he confessed that he manufactured methamphetamine for his and his friends' use. The fact that the methamphetamine was not *on* defendant's person when found by the police does not negate a finding of possession. *See* State v. Goodroad, 442 NW2d 246, 251 (SD 1989) (control over the premises where narcotics are found is sufficient); *see also* State v. Barry, 2004 SD 67, ¶9, 681 NW2d 89, 92-93. The methamphetamine was in defendant's home, a home he confessed he used to manufacture methamphetamine, and a home for which defendant exercises all dominion and control. There is sufficient evidence to sustain the conviction.

[¶70.]     There is also sufficient evidence to sustain defendant's conviction under SDCL 22-42-10, maintaining a place where drugs are used or stored. Defendant argues that the evidence is insufficient because the State did not prove that there were any sales of methamphetamine from defendant's residence and when, if ever, others may have used methamphetamine at the residence. The State, however, contends that the totality of the evidence shows that methamphetamine was used, stored, and sold in the home on an ongoing basis.

[¶71.]     We recognize that a conviction under SDCL 22-42-10 cannot be sustained when the possession is a mere isolated, personal use of the controlled substance. *See* State v. LaPlante, 2002 SD 95, ¶23, 650 NW2d 305, 311. Here, however, the totality of the circumstances supports the defendant's conviction. During the search of defendant's home, officers found several wire/metal strainers, coffee filters, zip-lock bags, a roll of sandwich bags, and numerous spoons that tested positive for methamphetamine. The officers found a digital scale, on which

there was a white residue that tested positive for methamphetamine. Also tested positive for methamphetamine were several snort tubes and pipes, and a white powder found in defendant's basement, which tested positive for Ephedrine, an ingredient for the manufacture of methamphetamine. Finally, the officers found a small baggie with a white powder that tested positive for methamphetamine. Based on this evidence and defendant's confession that he manufactured methamphetamine for himself and his friends, defendant's conviction under SDCL 22-42-10 is affirmed.

[¶72.]    Affirmed in part, reversed in part, and remanded.

[¶73.]    GILBERTSON, Chief Justice and ZINTER, Justice, concur.

[¶74.]    MEIERHENRY, Justice and SABERS, Retired Justice, dissent.


MEIERHENRY, Justice (dissenting).

[¶75.]    I respectfully dissent on issue one. We should not expand the Fourth Amendment community caretaker exception to homes for the following reasons: first, there is a lack of persuasive precedent from state and federal courts; second, the majority opinion's proposed standard does not give clear direction to law enforcement; third, the recognized police community caretaker function as it relates to automobiles is distinguishable; and, fourth, there is no reason to do so in light of the emergency and exigent circumstances exceptions already recognized.

*Constitutional Protection Against Search of a Home Without a Warrant*

[¶76.]    The Fourth Amendment to the United States Constitution and Article VI, § 11 of the South Dakota Constitution provide:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrant(s) shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

In *Hess*, Justice Konenkamp reiterated that, except for "specifically limited exceptions, every law enforcement entry into a home for the purpose of search and seizure must be made with a warrant." 2004 SD 60, ¶22, 680 NW2d at 324-25. The warrant requirement was explained as follows:

> We earlier noted that the Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. As the United States Supreme Court explained, 'physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]' Accordingly, it is well established that 'searches and seizures inside a home without a warrant are presumptively unreasonable.' Generally, this means that, with some specifically delineated exceptions, every law enforcement entry into a home for the purpose of search and seizure must be made with a warrant.
>
> The State has the burden of proving that a specific search falls into a delineated and limited exception. Legal analysis is limited to 'the facts perceived by the police at the time of the entry, not as subsequently uncovered.'

*Id.* ¶¶22-23 (internal citations omitted).

[¶77.]     The emergency and exigent circumstances exceptions are two of the "delineated and limited exceptions" permitting warrantless entry into a home. *Id.* ¶24. The United States Supreme Court and this Court have recognized and applied the emergency and exigent circumstances exceptions. *Mincey*, 437 US at 392, 98 SCt at 2413; *Hess,* 2004 SD 60, ¶24, 680 NW2d at 325 (citing *Payton,* 445 US at 590, 100 SCt at 1382; Warden v. Hayden, 387 US 294, 87 SCt 1642, 18 LE2d 782 (1967); *Heumiller,* 317 NW2d at 129 (citations omitted)).

*Most Courts Do Not Apply the Community Caretaker Exception to Homes*

[¶78.]     Initially, it is important to note that the United States Supreme Court has *only* applied the community caretaker exception to warrantless automobile searches. *Cady*, 413 US 433, 93 SCt 2523. The Court has ***not*** recognized or applied the community caretaker exception to a warrantless search of a home. In fact, most jurisdictions have not expanded the community caretaker exception to a warrantless search of the home. *See McGough*, 412 F3d at 1238 ("Were we to apply the community caretaking exception . . . in this case, we would undermine the [Fourth] Amendment's most fundamental premise: searches inside the home, without a warrant, are presumptively unreasonable."); United States v. Erickson, 991 F2d 529 (9thCir 1993) (rejecting the application of the community caretaker exception to the warrantless entry into a home); *Pichany*, 687 F2d 204 (stating the court would not permit the extension of the community caretaker function to permit the warrantless search of a warehouse); *Gill*, 755 NW2d 454 ("We now hold that a law enforcement officer's entry into a dwelling place cannot be justified alone on the basis that the officer is acting in a community caretaking capacity.").

[¶79.]     The majority cites to several cases that have applied the exception to entry into a home. The main case relied upon in the majority opinion, *Rohrig*, was intentionally limited to its own facts and later distinguished by the Sixth Circuit as standing for the proposition that the community caretaker function was applicable as a nuisance abatement measure. 98 F3d at 1524 n11. In *Rohrig*, the Sixth Circuit stated that it wished "to emphasize the fact-specific nature of [its] holding." *Id.* (cited by the majority to support the proposition that the community caretaker

exception applies to entry into a home, *see supra* ¶36 n8). It is also important to recognize that *Rohrig* was recently qualified by the Sixth Circuit in *Washington*, 573 F3d at 287-88. The court in *Washington* distinguished *Rohrig* on the basis that the police acted in *Rohrig* to stop the extremely loud music to prevent further harm to the community. The court went on to add the requirement that "true immediacy that absolves an officer from the need to apply for a warrant" is the crucial question in cases involving exceptions to the Fourth Amendment's warrant requirement. True immediacy was a factor that was not present in the case now before this Court as the officers had the time and opportunity to apply for a warrant before entering the apparently empty home.

[¶80.]    The majority also cites several cases to support the proposition that "[m]any courts have extended the community caretaker exception to the entry of a home." *Supra* ¶36 n8. However, a closer reading of these cases illustrates that no case stands for this proposition as broadly as it is being advanced in the majority opinion. In sum, all of the cited cases are distinguishable or actually stand for a different proposition. *See Nord*, 586 F2d at 1289 (stating the facts of the case had certain "emergency features" unlike those found in the case before this Court); *York*, 895 F2d at 1029-30 (holding that no search had taken place when police entered defendant's home, at the request of defendant's guests, to assist in removing guest's daughter and belongings from home because defendant was intoxicated, belligerent, and had threatened them); *Rohrig*, 98 F3d 1506 (holding under the specific facts presented that the community caretaker exception was applicable as a nuisance abatement measure); *Ray*, 981 P2d at 937 (involving an apartment with an open

door with the "ransacked" interior in plain view); *Hoth*, 718 A2d 28 (applying the *emergency exception* to the warrant requirement); *Williams*, 962 A2d at 219 (involving the stop of a pedestrian on a traffic median); *Crawford*, 659 NW2d 537 (holding that stop of defendant's *vehicle* was reasonable under the community caretaker exception); *Blair*, 62 P3d 661 (reversing defendant's conviction and holding that *emergency doctrine* did not apply to facts of case); *Alexander*, 721 A2d at 277 (imposing a reasonableness standard, not advancing the community caretaker exception specifically); *Davis*, 497 NW2d at 920 ("[A]lthough administering emergency aid is referred to as one of the community caretaking functions of the police, this should not have any effect on the law governing the emergency aid exception." The court went on to reverse the conviction on the grounds that report of shots being fired at motel did not give officers reasonable belief that someone could potentially be in need of immediate aid, which precluded officers from entering motel room under emergency aid exception.); *Lemieux*, 726 NW2d at 787 ("[C]oncluding that the warrantless entry was justified under the emergency-aid exception to the warrant requirement."); *Garbin*, 739 A2d at 1018-19 (involving an intoxicated person operating his vehicle in his garage who opened his garage door at the request of the police who then "observed the tires of defendant's truck spinning, creating smoke, and the front bumper pushing against the rear of the garage."); *Christenson*, 45 P3d 511 (holding that police entry into defendant's home without a warrant was not justified under community caretaker statute or the emergency aid doctrine exception); *Laney*, 76 SW3d 524 (involving a welfare check of a child who was known to be in the home of a man twice arrested for indecency

with a child); *Ziedonis*, 707 NW2d at 570 (applying a three-part test with a four-part subtest distinguishable from that advanced in the majority opinion in evaluating the community caretaker exception to a factual scenario involving a one and one-half hour vicious dog "emergency"). Instead, these cases together stand for the proposition that the community caretaking *function* of police is an aspect of the emergency exception and emergency aid exception. The community caretaker *exception*, however, is an independent and broader exception to the Fourth Amendment and has not been expansively recognized by any authority outside of the context of motor vehicles.

*Proposed Standard Unclear and Ambiguous*

[¶81.]     The standard and application of the community caretaker exception espoused by the majority opinion leaves too much ambiguity and too little direction for law enforcement. Allowing police to enter a private home based on a mere possibility that someone inside might be in danger obliterates the Fourth Amendment guarantee against unreasonable searches and seizures. The majority states at one point that "the purpose of community caretaking must be the objectively reasonable independent and substantial justification for the intrusion; the police action must be apart from the detection, investigation, or acquisition of criminal evidence; and the officer should be able to articulate specific facts that, taken with rational inferences, reasonably warrant the intrusion." *Supra* ¶41. The standard advanced and the standard actually applied by the majority, however, are quite different.

[¶82.] The accepted standard for the community caretaker exception to the Fourth Amendment comes from *Cady*, 413 US 433, 93 SCt 2523 (involving the search of a *vehicle* for a gun reasonably believed to be located within). *Cady* emphasized the importance of reasonableness in construing Fourth Amendment protections. *Id.* at 439, 93 SCt at 2527. The only controlling test provided by the United States Supreme Court limits this exception to vehicles. Further, this test is not only limited to the search of vehicles, but it also requires that the police action involved be "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Id.* at 441, 93 SCt at 2528. The standard provided by the majority does not include this language. The majority requires a lower threshold than the one provided by the United States Supreme Court for vehicles. The Fourth Amendment's strong protections against entry into the home without a warrant should require greater protections and more stringent standards than those afforded to automobiles.

*Distinction Between Vehicle and Home Searches*

[¶83.] Constitutionally speaking, the difference between the search of a car and the search of a home is extremely important. *Id.* at 439, 93 SCt at 2527. The United States Supreme Court in *Cady* outlined some of the reasons for the constitutional differences in treatment between vehicles and homes by stating:

> Because of the extensive regulation of motor vehicles and traffic, and also because of the frequency with which a vehicle can become disabled or involved in an accident on public highways, the extent of police-citizen contact involving automobiles will be substantially greater than police-citizen contact in a home or office. Some such contacts will occur because the officer may believe the operator has violated a criminal statute, but many more will not be of that nature.

*Id.* at 441, 93 SCt at 2528. After broadly laying the analytical framework for the community caretaker doctrine in the vehicular context, the majority applies that exception to the search of a house because "homes cannot be arbitrarily isolated from the community caretaking equation." *Supra* ¶41. On the contrary, most jurisdictions have isolated homes from the community caretaker equation. This isolation is not arbitrary, but based on the constitutional differences between homes and automobiles.

[¶84.] Constitutional jurisprudence in the United States has created rules distinguishing searches of cars and homes. *See Rinehart*, 2000 SD 135, ¶7, 617 NW2d at 843-44 (permitting the search of a vehicle under the community caretaker exception) (citing *Cady*, 413 US 433, 93 SCt 2523); *Payton*, 445 US at 586, 100 SCt at 1380 ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]"); *Katz*, 389 US at 357, 88 SCt at 514 ("[E]very law enforcement entry into a home for the purpose of search and seizure must be made with a warrant."). Thus, the analysis from *Cady* need not be extended to searches of a home. *See supra* ¶35.

*Emergency and Exigent Circumstances Exceptions*

[¶85.] Even without the community caretaker exception, police can respond and enter a home in emergencies to preserve life or property. Likewise, police can enter a home without a warrant with probable cause if the police reasonably believe "that delay in procuring a search warrant would gravely endanger life, risk destruction of evidence, or greatly enhance the likelihood of a suspect's escape."

*Hess*, 2004 SD 60, ¶24, 680 NW2d at 325. The majority opinion discusses these two exceptions at length.

[¶86.] In this case, had the officers had an objectively reasonable basis to conclude someone was still in the house and was in danger of asphyxiation from the gas, they may have been justified in entering without a warrant under the emergency doctrine. For example, had the neighbor who approached the officers told them he saw five people go into the house but only saw four leave, the officers may have been justified in entering without a warrant. However, by permitting officers to enter the home without an objectively reasonable basis to believe someone was inside and in danger, this Court would be handing the police unfettered discretion to enter someone's home. The result could serve to undermine the thrust of the Fourth Amendment and the notion that "searches and seizures inside a home without a warrant are presumptively unreasonable." *Id.* at 324 (citing *Payton*, 445 US at 586, 100 SCt at 1380). The majority's expansion of the community caretaker exception to the Fourth Amendment, through the standard adopted, goes too far and disrupts the balance between necessary police action and the constitutional protections afforded to South Dakotans. We should maintain the natural balance between these sometimes competing interests that weighs in favor of obtaining a warrant prior to entering an individual's home. This is especially so in this case where there was no objective basis to conclude a "true immediacy that absolves an officer from the need to apply for a warrant" was present. *Washington*, 573 F3d at 287-88 (distinguishing *Rohrig*, 98 F3d at 1524).

[¶87.] It is also interesting to note that under the facts of this case, there was no reason why the officers could not have secured the home and sought a search warrant. Had the officers added up all the clues – swapped gas meter, ammonia fumes, propane tank, Sudafed purchases, and freezer-hose-bucket contraption – the officers would have had probable cause for a warrant.

[¶88.] For these reasons, I respectfully dissent.

[¶89.] SABERS, Retired Justice, joins this dissent.